## PEARSON v. DURELL.

### No. 6698.

Circuit Court of Appeals, Sixth Circuit.

May 17, 1935.

J. A. Fowler, of Knoxville, Tenn. (Harley G. Fowler and S. F. Fowler, both of Knoxville, Tenn., on the brief), for appellant.

Frank Montgomery, of Knoxville, Tenn. (W. J. Donaldson, of Knoxville, Tenn., on the brief), for appellee.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

MOORMAN, Circuit Judge.

This is a suit at law brought by the appellant, receiver of the Holston-Union National Bank of Knoxville, Tenn., under section 91 of 12 USCA, to recover from the appellee an amount paid to him on his check by the bank the day before the bank was placed in the hands of the Comptroller of the Currency for liquidation. On the hearing in the District Court a jury was waived and the case tried by the judge, who found the facts in favor of the appellee and entered judgment accordingly.

The following facts are pertinent to the issues: The appellee is a banker at Harriman, Tenn. The Bank of Tennessee of Nashville, Tenn., was owned by Caldwell & Co. of that city, a company through which Rogers Caldwell and Luke Lea engaged in various financial ventures. In 1927 Caldwell and Lea acquired a block of stock in the Holston-Union National Bank of Knoxville, Tenn., through which, with allied interests, they were able to control the bank. J. B. Ramsey was elected president of the bank. In January of 1928 he and Lea caused the appellee to be elected to the board of directors. Thereafter, until the bank failed in November of 1930, there were 42 meetings of the directors, 23 of which the appellee attended, the latest one October 14, 1930. About one year after appellee qualified as director he opened an account in the bank by depositing with it $5,000. On August 29, 1930, he deposited $47,520.41. Between that date and November of 1930 he made further deposits of small amounts, and in the same period drew nine checks against the account. On November 10, 1930, there was a balance to his credit of $50,684.83. On November 3, 1930, Ramsey, who was closely associated with Caldwell and Lea, went to Chattanooga, Tenn., to endeavor to sell their stock in the Bank of Tennessee to a group of capitalists in that city. He was unsuccessful. On the following day Caldwell & Co. was placed in the hands of a bankers' committee. The news of this action was published in the Knoxville papers. On the 5th and 6th articles appeared in the papers—evidently inspired by Ramsey—attempting to allay any suspicion that the failure of Caldwell & Co. would affect the Holston Bank. On the 7th the Bank of Tennessee was closed. Newspapers throughout the state published this fact, with the information that a committee representing the clearing house banks of Nashville had determined that the bank could not be further operated but would have to be liquidated. Immediately after the publication of the news of the failure of Caldwell & Co., depositors began to withdraw their funds from the Holston Bank. The withdrawals had reached such proportions and the condition of the bank was so precarious by Sunday, November 9th, that a meeting of the board of directors was held at the residence of one of the directors, and it was determined to ask the Federal Reserve Bank at Atlanta to furnish funds to tide the bank over the run. The bank's deposit in the Reserve Bank at that time was about half a million dollars short of the amount required by law. Ramsey telephoned the governor of the Reserve Bank at Atlanta in an attempt to obtain funds, but was unsuccessful. The bank opened the following morning, November 10th. Early that morning the appellee arrived in Knoxville from his home and presented to the East Tennessee National Bank, upon its opening at 9 a. m., a check for his entire balance in the Holston Bank. This check was accepted by the Holston Bank for payment through the clearing house about 10:30 a. m. It was found, however, in the balancing of the clearing house accounts for the day that the bank owed $108,000 to the East Tennessee Bank and $104,000 to another bank at Knoxville. A vice president of the Holston Bank requested the two creditor banks to await settlement of these debits until the banks closed at 2 p. m. The creditor banks refused, and Ramsey and other officers of the Holston Bank had a conference with officers of the creditor banks at which Ramsey stated that the balance of the Holston Bank in the Reserve Bank in Atlanta was approximately $250,000. The creditor banks insisted upon settlement that day before 2 o'clock, and Ramsey directed Brown, a vice president of the bank, to wire the Reserve Bank to transfer sufficient funds to the creditor banks to pay the balances due them. The transfers were made about five minutes before the banks closed for the day. Earlier in the conference Ramsey had suggested that the creditor banks accept bonds on the bank building of the Holston Bank in settlement of the balances due them. This suggestion was rejected. The appellee's check of $50,684.83 was either cleared by checks on the East Tennessee Bank in the hands of the Holston Bank or was charged against the $108,000 transferred to the East Tennessee Bank. It was credited to the appellee in a new account in the East Tennessee Bank, and later

the amount thereof was paid out by the bank on his order. The Holston Bank never opened its doors after the closing hour that day. The next day, Armistice Day, the directors met and at 6 o'clock in the afternoon passed resolutions suspending business and turning the affairs of the bank over to the Comptroller of the Currency.

It is not important whether the appellee's check is to be deemed as having been paid at the time it was accepted for payment by the bank or later when the funds were transferred from the Reserve Bank to the East Tennessee Bank, as there was no substantial change in the condition of the bank between the two events or, indeed, from the earlier one to that of the turning over of the bank to the Comptroller. In either view the appellant's right to recover must rest upon a showing of payment after the commission of an act of insolvency or in contemplation of the commission of such an act, and with a view to the preference of the appellee to another creditor. See National Security Bank v. Butler, 129 U. S. 223, 231, 9 S. Ct. 281, 32 L. Ed. 682; McDonald v. Chemical Nat. Bank, 174 U. S. 610, 618, 19 S. Ct. 787, 43 L. Ed. 1106; Roberts v. Hill (C. C.) 24 F. 571, 573; Stapylton v. Stockton (C. C. A.) 91 F. 326; Ball v. German Bank (C. C. A.) 187 F. 750, 753; Brill v. McInnes (C. C. A.) 14 F.(2d) 306; Parks v. Knapp (C. C. A.) 29 F.(2d) 547; First Nat. Bank of Ortonville, Minn., v. Andresen (C. C. A.) 57 F.(2d) 17, 19.

The trial judge found that the check was not paid after or in contemplation of the commission of an act of insolvency. We think the evidence required a finding to the contrary. The proofs show without contradiction that in the last four days the bank was open the withdrawals exceeded deposits by more than a million dollars, and that on the 10th, the fourth day, the bank was without funds to pay its clearing house balances. It was shown, too, that as early as the 9th practically all of the bank's paper eligible for rediscounting had already been rediscounted. On that day the bank had been refused funds by the Federal Reserve Bank. Other banks from which, under different circumstances, it might have hoped for assistance were either unwilling or unable to help it. On the morning of the 10th it had neither the money nor any assets on which it could obtain money to meet its obligations. There can be no reasonable doubt, in our opinion, that its insolvency was as much an actuality at that time as it was a day later when its directors made the admission. Likewise there can be no escape, we think, from the view that the officers of the bank then contemplated such admission. They may have hoped that by some chance they could obtain funds and continue to operate, but they are to be charged with contemplating that which any reasonable person familiar with the situation was bound to know would happen, and that was, the bank would have to admit its inability to pay, if not that day, the following, and turn its affairs over to the Comptroller.

The trial judge also found that the check was paid in regular course of business and without intent on the part of the bank to prefer the appellee. The appellant requested a contrary finding, which in our opinion was required by the evidence. It is, of course, true that payments made by an insolvent bank to its customers in the ordinary course of business are not to be regarded as preferences. The transaction here under consideration was not, however, a current business transaction such as is conducted by a bank with one of its patrons. It was not an incident in the course of a daily depositing of funds and drawing of checks. All of the appellee's deposit was withdrawn in a single sum, not to use in his business or for investment, but to be placed elsewhere for safekeeping. In view of the size of the deposit, with the public distrust of and the appellee's relation to the bank, the presentation of the check for payment was itself an indicium of a purpose to obtain an advantage of other creditors. Whether the appellee was or was not seeking a preference, Ramsey intended, in our view of the evidence, to give one. It is inescapable that he knew the bank was insolvent. To say that he did not intend to give a preference by paying the check would be to ascribe to him a disbelief in the result of an act that no reasonable man in his situation could doubt. Brown, who arranged for the transfer of the funds from the Reserve Bank, testified that at the time he made the arrangement the only hope the officers of the Holston Bank had was that the East Tennessee Bank would take it over, and they knew that if the East Tennessee Bank did not take it over, the payment of the appellee's check would result in a preference. The making of the payment in such circumstances leaves no room for doubt that a preference was intended.

The evidence of the appellee's purpose to obtain a preference is also clear, notwithstanding his testimony that he did not expect the bank to fail, but was dissatisfied with its management and for that reason decided to transfer his account to another bank. His statement that he came to Knoxville early in the morning to make the transfer because a friend who was to accompany him wanted to get back to Harriman by noon is not convincing. Nor can we accept the explanation of his request of the East Tennessee Bank to conclude the transaction that day—that he expected to leave for Nashville the next day to be gone indefinitely. Apparently he did go to Nashville for a day or two to look into an account owing the city of Harriman by Caldwell & Co. When asked whether he did not know his check would be paid by the Holston Bank the following day if the bank was solvent, he replied: "I did not know but what I would be gone indefinitely. I wanted the thing settled. That was all." To accept his statement that he did not intend to obtain a preference but thought the bank was solvent would be to give credence to words as against an indisputable inference to be drawn from a course of action. We think the statement is to be given no evidential effect when considered in the light of the purposes shown by his acts. It is, however, the intent of the officers of the bank which is controlling, and the evidence convincingly shows that they paid the check, not in the regular course of business, but in contemplation of an act of insolvency and with an intent to prefer the appellee to other creditors of the bank. We are of opinion that there is no substantial evidence to the contrary.

The judgment of the District Court is reversed and the cause remanded for a new trial.