### KULLMAN & CO. v. WOOLLEY.*
#### No. 7986.

Circuit Court of Appeals, Fifth Circuit.
April 18, 1936.

*Rehearing denied June 5, 1936.

C. F. Engle and S. B. Laub, both of Natchez, Miss., for appellant.

W. A. Geisenberger, of Natchez, Miss., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

This appeal questions whether certain payments made to a general depositor by a national bank while on a "restricted basis" during the "banking holidays" of March, 1933, are void as preferences under 12 U.S. C.A. § 91. The receiver of the Britton & Koontz National Bank of Natchez, Miss., has obtained a decree for the recovery of such payments from its depositor, Kullman & Co., a corporation, and the latter appeals.

The main facts are undisputed. The bank in November, 1932, had been required by the Comptroller to obtain $100,-000 of new capital. On March 2, 1933, its condition is thus described by its executive vice president, the only witness on the subject: "I would say the Bank was insolvent, but it was considerably after March 1st that I became aware of it. At the time, I believed the Bank to be solvent." "We did not go on a restricted basis on account of any insolvency of the Bank. It was strictly external conditions that brought that about, and the purpose was to have the two local banks working in harmony." "We were pinched for money. The Bank was borrowing money. I knew the Bank was in strained circumstances. * * * Nobody knew what was going to happen. We didn't know if we kept open whether we would have a run, and we were glad to cooperate. We were afraid that if we had a run it would bring on insolvency. We had about $150,000 on hand. Total deposits of $1,000,000. Bills payable $211,000." "Insofar as the other bank went on a restricted basis we could not jeopardize the Bank by staying open. By borrowing money we had met current demands." "Considering the character of the assets we were carrying, the Bank had probably been insolvent for some time, probably a year, but that is looking backward." On March 1, 1933, the state superintendent of banks by telegrams sent not

only to state but also national banks directed that restriction be placed on the withdrawal of deposits so that from the morning of March 2d until further advised only $25 plus 5 per cent. of the remaining deposit should be withdrawn, but that new deposits on March 2d and afterwards should be kept in separate accounts and not commingled with the other assets of the banks and handled under a special contract to be executed by each new depositor. The withdrawal of the initial $25 was forbidden by later telegrams. There was only one other bank in Natchez, a state bank. The vice president of the national bank further testified: "We didn't have to do it, but we did it in cooperation. We got in touch with the other local bank and we cooperated with them and closed." "In order to cooperate with the City Bank & Trust Company we went on a restricted basis the same as they did." "In putting on the restriction we were putting on precaution and cooperating both." "The two banks agreed they would not follow the instructions in that wire, but in addition to the instructions in it that they would allow payroll checks and checks for foodstuffs to go through." "We operated under that agreement up until March 6th. After March 6th we operated under the instructions from the Treasury Department." Many checks of depositors who had sufficient money to their credit were on March 2d and afterwards refused payment because of the restrictions adopted. On March 6th the President issued his proclamation of a "bank holiday" (No. 2039, 12 U.S.C.A. § 95 note) for all banks to prevent the withdrawal and hoarding of coin and currency and the export of it, under authority of the act of October 6, 1917 (40 Stat. 411). The proclamation prohibited payment of old deposits except as authorized by regulations of the Secretary of the Treasury approved by the President, and directed the creation of "special trust accounts" for new deposits to be kept separately in cash or in federal reserve banks, which new deposits should be subject to withdrawal on demand. 48 Stats. 1689, No. 2039, 12 U.S.C.A. § 95 note. Regulations issued the same day are testified to have permitted withdrawal of 5 per cent. of old deposits and of money for payrolls and for foodstuffs. The bank applied within a few days to the Treasury Department for leave to reopen, but leave was refused. A Conservator was then appointed, and on July 1, 1933, a receivership because of insolvency was established. The receiver has paid dividends to date of 50 per cent. besides the 5 per cent. set apart to all depositors while the bank was restricted, and has assessed the stockholders 100 per cent. The withdrawals by Kullman & Co. here involved occurred mainly on March 2d, 3d and 4th. The largest item is $985, withdrawn in cash on March 4th to pay officers' · salaries and employees' wages. So far as the withdrawals represent the initial $25 and 5 per cent. of the remaining deposit, the receiver seeks no recovery, but pleads and proves that as to this all depositors have been treated alike, either by the bank or by an adjustment which he has made. He · attacks only what was withdrawn by this depositor (and some other depositors) for pay rolls and foodstuffs as being preferential and void under 12 U.S.C.A. § 91.[1]

■ The statutory provisions to be construed and applied come from the original National Bank Act of June 3, 1864, 13 Stat. 115. They antedate by many years the definitions of "insolvency" and "preference" contained in the Bankruptcy Act of 1898 (11 U.S.C.A. § 1 et seq.). The latter act and the decisions under it are to be excluded from thought. The insolvency of the Bank Act is commercial insolvency, the inability of a business man to pay his debts as they become due in the ordinary course of his business. Such was the meaning of the word when used in the Bankruptcy Act of 1867 (14 Stat. 517) as applied to merchants and traders. Toof v. Martin, 13 Wall. 40, 20 L.Ed. 481; Buchanan v. Smith, 16 Wall. 277, 308, 21 L.Ed. 280; Wager v. Hall, 16 Wall. 584,

---

[1] 12 U.S.C.A. § 91: "All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable things for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void."

599, 21 L.Ed. 504; Dutcher v. Wright, 94 U.S. 553, 557, 24 L.Ed. 130. The bank statute voids "payments of money to either (shareholder or creditor) made after the commission of an act of insolvency or in contemplation thereof." In the much-quoted case of Roberts v. Hill (C.C.) 24 F. 571, 573, these terms are well interpreted thus: "Insolvency, as ordinarily defined, is that condition of affairs in which a merchant or business man is unable to meet his obligations as they mature in the usual course of his business. Thompson v. Thompson, 4 Cush. [Mass.] 127; Vennard v. McConnell, 11 Allen [Mass.] 555; Wager v. Hall, 16 Wall. 584, 599 [21 L.Ed. 504]. An act of insolvency takes place when this state of affairs is demonstrated and the merchant has actually failed to meet some of his obligations. A bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations."

■ Similar definitions were advanced in Hayden v. Chemical Nat. Bank (C.C.A.) 84 F. 874, 876, and an act of insolvency was said to take place also when the bank has "made an assignment for the benefit of creditors, suspended business, or done any of those things which indicate to creditors that a debtor has become insolvent." But it was held that before such an act payments in the ordinary course of business were to be upheld, although the bank in fact was unable to pay all its obligations. That conclusion was upheld on appeal in McDonald v. Chemical Nat. Bank, 174 U.S. 610, 19 S.Ct. 787, 43 L.Ed. 1106. These propositions are further established and applied in the recent cases of Nelson v. Lewis (C.C.A.) 73 F.(2d) 521; Aycock v. Bradbury (C.C.A.) 77 F.(2d) 14; Pearson v. Durell (C.C.A.) 77 F.(2d) 465. But to void a payment or transfer it is not enough that it occurred after an act of insolvency or in contemplation thereof, because the statute does not end its description there. It adds as a further description of the nullified act: "Made with a view to prevent the application of its assets in the manner provided by this Chapter or with a view to the preference of one creditor to another." One but not

both of these "views" or intentions must exist on the part of the bank and may be conclusively inferred from the circumstances; but the recipient need not have such intention nor any knowledge or suspicion of the bank's insolvency. National Security Bank v. Butler, 129 U.S. 223, 9 S.Ct. 281, 32 L.Ed. 682. The expression "with a view to the preference of one creditor to another" means the giving of some substantial advantage to one creditor over others having the same rights. It may be accomplished by a full payment, or by a new security, or by any other dealing not in the usual course of business which puts him ahead in the race for assets. In re Hapgood, 11 Fed.Cas. page 473, No. 6,044, 2 Lowell, 200, quoted approvingly in Re Stevens, 38 Minn. 432, 38 N.W. 111, a preference is declared to be "a payment to one creditor which will give him an advantage over the others, or which may possibly do so." Having in view the right of all general depositors to payment on demand within business hours in the order in which their demands are made, a bank's unjustified refusal after an act of insolvency or in contemplation of it to pay one depositor while paying another is a preference of the latter, although the bank officers hope and desire to pay them all at a later date.

■ We assume that the Presidential proclamation which purported to be directed against the hoarding of cash was well supported by the federal statute which it cites, and that the regulations under it were valid, and that compliance with them by the banks was compulsory.[2] Refusals to pay checks solely because of them would not be acts of insolvency, but only the observance of a new law of banking. Therefore payments of checks which were thereby permitted would not in themselves be preferences. Yet if in fact they were made in contemplation of insolvency and with a view to a preference, they would be null. But the transactions here attacked were in the main not had under the President's proclamation but during the week before. If the state superintendent of banks had authority to make a rule for state banks, it is not contended that he had any over this national bank. The evidence is express that its directors did not restrict

---

2 Compare Pestcoe v. Sixth National Bank, 112 Pa.Super. 373, 171 A. 302, where the Joint Resolution of Congress of Feb. 25, 1933, 47 Stats. 907, 12 U.S. C.A. § 1 note, was involved. And see the ratifying Act of March 9, 1933, §§ 1 and 4, 48 Stat. 1, 12 U.S.C.A. §§ 95b, 95.

payments because they had to, but because they desired to co-operate; and the rule they actually established went beyond the equal treatment of depositors proposed by the superintendent and excepted from it checks for pay rolls and foodstuffs. And we are told that co-operation was not the sole motive for the restrictions, but joined with it was the knowledge that the bank had already borrowed more money than it had on hand; that its general deposits were six or seven times more than its cash, and that it could not stand a run, which was likely to happen. For all these reasons the directors ordered the bank closed for an indefinite period on March 2d. Thereafter it made no further loans, received no further general deposits, but only "trust accounts" kept separate from the assets of the bank, and it paid only such checks on old deposits as came within a narrow rule established by itself. The bank was not open, but only its front door. The checks for pay rolls and foodstuffs were not paid in the ordinary course of business on demand, but only by special dispensation on satisfactory proof of what they were given for. The bank never re-opened, and in a few weeks was, without any proven change in its assets and liabilities, declared insolvent in the common sense. The bank paid 5 per cent. to its depositors as a class. Kullman & Co., by reason of drawing money for its salaries and wages, and perhaps other small checks for foodstuffs, got about 90 per cent. of its deposit. It got at once a preference in time; that it got a preference in final outcome is now apparent. When the bank of its own will suspended its business for an indefinite period and refused to pay out deposits on demand partly because its officers knew it was likely to fail if it did otherwise, it committed an act of insolvency. They may have hoped at some time to resume business and pay all demands in full. This we take to be the meaning of the vice president in his repeated testimony that there was no intention to prefer one depositor over another. But, under the circumstances, they could not rightly refuse to pay the most of their depositors more than 5 per cent. and at the same time pay Kullman & Co. and a few others large sums in addition. They necessarily knew that to do so not only preferred the latter in time, but also gave them present cash while others had only a defaulted and precarious obligation against a closed bank.[3] If pay rolls and foodstuffs ought to have been provided for, the bank should have made special loans for them not subject to offset by the deposit accounts; and this is the result reached by now adjudging the payment of these checks to be void. The bank had no better right to prefer a depositor because he owed for wages or food than to prefer a depositor who was a widow, or an orphan, or a kinsman of the bank's officers. If the bank had proven able to resume its business, no harm would have come from the preference. Its validity would not have been questioned. But under the circumstances here shown, we think the District Court correctly held the payments invalid.

There is a contention that three of the items sued for and recovered were made since the Presidential proclamation, to wit on March 6, $134.35; March 17, $129.21; and March 18, $5.87. It may be doubted whether the Treasury Regulations in so far as they allowed exceptional and unequal payments to depositors could be applied to a bank which had already voluntarily closed. The Regulations are not in this record. If we might judicially notice them, the record still fails to show clearly what the three checks mentioned were given for, or that they came within the permission of the Regulations. The evidence touching those paid on March 17th and 18th indicates that they were paid because they had been drawn before March 2. The date the drawer drew them is not material for present purposes, but only the date and circumstances of their payment by the bank. Kullman & Co. had already drawn more than the 5 per cent. allowed to every depositor. The burden of showing error is on the appellant. We cannot say that either one of these payments was not, as the lower court found, an additional preferential payment.

Judgment affirmed.

---

[3] A state statute which authorized banks to be put on a restricted basis but allowed full payment of public moneys on deposit was held unconstitutional because of the preference. Ghinger v. Pearson, 165 Md. 273, 168 A. 105.