**MBank NEW BRAUNFELS, N.A., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, in its Capacity as Receiver for MBank Dallas, N.A., and in its Corporate Capacity, and the Deposit Insurance Bridge Bank, N.A., Defendants.**

No. CA3–89–1064–F.

United States District Court, N.D. Texas, Dallas Division.

July 10, 1991.

---

Thomas W. Luce, III, Jeffrey C. King, David Bryant, Kim J. Askew, R. Doak Bishop, Hughes & Luce, Dallas, Tex., John D. Hawke, Jr., Howard N. Cayne, Arnold & Porter, Washington, D.C., for plaintiff.

Mark I. Rosen, Dep. Gen. Counsel, Thomas A. Schulz, Asst. Gen. Counsel, Robert G. Clark, Senior Litigation Atty., Joan E. Smiley, Senior Atty. Robert S. Cessar, Atty., Federal Deposit Ins. Corp. Washington, D.C., Robert W. Patterson, John L. Rogers, Peter F. Lovato, III, Lawrence F. Gates, Wm. J. McKenna, Nancy Anglin, Robert F. Reklaitis, Hopkins & Sutter, Dallas, Tex., for defendants.

## JUDGMENT AND MEMORANDUM OPINION

ROBERT W. PORTER, Senior District Judge.

Before the Court are three motions: (1) the Plaintiff MBank New Braunfels' Motion for Summary Judgment, (2) the Defendant FDIC's Motion for Summary Judgment, and (3) the Plaintiff's Motion to Dismiss Counterclaim or for Summary Judgment on Counterclaim. The Court is of the opinion that this case is ripe for summary judgment. After careful consideration of the pleadings and exhibits filed by the parties, the arguments of counsel and the pertinent legal authorities, the Court finds that summary judgment should be granted in favor of the Plaintiff MBank New Braunfels.

### I. Summary of the Facts

MBank New Braunfels was one of 25 banks owned by MCorp, a Delaware corporation doing business in Texas.[1] In the late 1980s, particularly 1988 and early 1989, some of MCorp's banks ("MBanks") were experiencing financial difficulty. To bolster the troubled banks' liquidity, others of the MBanks began regularly lending funds they had borrowed from the Federal Reserve Bank to those problem banks, on a short-term basis. When MCorp requested aid for its banks from the FDIC, in October 1988, that agency stated it would consider providing help, but only if these regular federal funds loans continued among the MBanks. The FDIC asked MCorp to sign a document, known as the "Standstill Agreement," to this effect.

MBank New Braunfels was one of those MBanks that had been borrowing federal

---

1. Many of the facts pertinent to this case are set forth in the Court's memorandum opinion in the case of *MCorp v. Clarke,* 755 F.Supp. 1402 (N.D.Tex.1991).

funds and then loaning them to another MBank. The bank to which MBank New Braunfels habitually lent its federal funds was MBank Dallas, one of the largest, and most troubled, of the MBanks.

By late 1988, the MBanks' money problems had become common knowledge in the financial world.[2] MBank New Braunfels and other MBanks, however, continued the federal funds transactions. In late March 1989, the situation changed rapidly. A shareholders' group brought an involuntary Chapter 7 action against MCorp in federal court in New York. The MBanks were notified by a special mailing, called an "MGram," on March 27, 1989. That morning, MBank New Braunfels asked MBank Dallas for the return of $46.9 million in federal funds that had been on overnight loan. The demand was granted, but demands that other MBanks made on MBank Dallas later that day for the return of federal funds loaned were not answered.

The next day, March 28, MBank New Braunfels asked MBank Dallas to release the remainder of its federal funds, $17.1 million made on a term loan. Other MBanks also continued to press for the return of their federal funds loans. MBank Dallas granted none of these requests. Also that day, the Federal Reserve Bank notified MBank Dallas that it wanted immediate payment of all outstanding advances, $1.425 billion, and that the bank's line of credit to the Federal Reserve would be severed. That evening, FDIC personnel entered the MBanks and evaluated them.

In determining which banks were insolvent, the FDIC and the Comptroller of the Currency (who sits on the FDIC's Board of Directors) assessed the banks' individual assets and liabilities. Regarding the federal funds loans, the FDIC and the Comptroller decided that the MBanks who lent funds to MBank Dallas should be treated as though they would recover only 80 percent of par.[3] In reaching this figure, the FDIC and Comptroller calculated that these creditor MBanks should receive only the value they would have received in a straight liquidation of those two banks. Depositors and other outside creditors of MBanks Dallas and Houston were to be reimbursed in full, with the liquidation value of their money augmented by money from the FDIC Insurance Fund.

This liquidation-level valuation left the MBanks who had loaned federal funds in a precarious position. Not having been reimbursed in full, the liabilities for many of these banks outweighed their assets. By the morning of March 29, 1989, the FDIC had declared 20 of the 25 MBanks insolvent.[4] Twelve of those 20 banks, according to MCorp's figures, would not have been declared insolvent had their federal funds loans to MBank Dallas been rated at full value.[5] The 20 banks were taken over by the Deposit Insurance Bridge Bank, an institution created by the FDIC expressly as a short-term holding company, and later sold to Banc One, an Ohio corporation.

MBank New Braunfels remained solvent. It filed this suit April 26, 1989, to recover the $17.1 million in term federal funds loaned to MBank Dallas, none of which has ever been returned.

## II.  Contentions of the Parties

MBank New Braunfels (MBNB) alleges that the Defendant's actions toward it have

---

**2.** *See* Exhibits to the Affidavit of Sherwin R. Koopmans of June 12, 1989, attached as Appendix A of Appendix to the FDIC Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Nov. 16, 1989.

**3.** MBank creditors of MBank Houston, the other major recipient of federal funds loans, were treated as though they would receive 78 percent of par.

**4.** The 20 banks declared insolvent were: MBank Abilene, N.A.; MBank Alamo (San Antonio), N.A.; MBank Austin, N.A.; MBank Brenham, N.A.; MBank Corsicana, N.A.; MBank Dallas,

N.A.; MBank Denton County (Lewisville), N.A.; MBank Fort Worth, N.A.; MBank Greenville, N.A.; MBank Houston, N.A.; MBank Jefferson County (Port Arthur), N.A.; MBank Longview, N.A.; MBank Marshall, N.A.; MBank Mid-Cities (Arlington), N.A.; MBank Odessa, N.A.; MBank Orange, N.A.; MBank Round Rock, N.A.; MBank Sherman, N.A.; MBank Wichita Falls, N.A.; and MBank The Woodlands, N.A.

**5.** MBanks Brenham, Corsicana, Denton County, Jefferson County, Longview, Marshall, Mid-Cities, Odessa, Orange, Sherman, Wichita Falls, and The Woodlands.

violated the National Bank Act, 12 U.S.C. § 91, 194, and the law in operation at the time the federal funds valuations were made, 12 U.S.C. § 1821(d). These laws demand that creditors of a failed bank receive fair and equal treatment regarding their claims. *See White v. Knox*, 111 U.S. 784, 786, 4 S.Ct. 686, 686–87, 28 L.Ed. 603 (1884) ("All creditors are to be treated alike.")

The FDIC's actions further, MBNB alleges, violated its rights of due process and just compensation as established by the Fifth Amendment. MBNB also argues that it is entitled to the imposition of a constructive trust under state law.

The FDIC first claims that this Court does not have jurisdiction in this case. First, the FDIC argues that sovereign immunity shields it from this suit. Second, even if it may be interpreted that the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., has waived the FDIC's sovereign immunity, the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., bars the Plaintiff's suit. Third, the FDIC characterizes the $17.1 million sought by MBNB as a penalty, with which the FDIC may not be charged.

If federal jurisdiction is found to exist, the FDIC defends its actions on the grounds that the FDIC/Corporate has absolute discretion under the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., to choose what parties will receive enhancements from the FDIC Insurance Fund. The FDIC characterizes the federal funds transactions between MBank Dallas and MBNB as contributions to MCorp's corporate capital that should be subordinated to the claims of other creditors. To pay MBNB the $17.1 million, the FDIC claims, would be to award the bank an undeserved windfall.

Additionally, the FDIC seeks the return of the $46.9 million obtained by MBNB from MBank Dallas on March 27, 1989, claiming that this payment was a voidable preference payment and part of "an insider run"[6] on MBank Dallas in what became its final days. The FDIC also claims it may recover this payment and prevent payment of the $17.1 million by applying the concepts of equitable subordination, a theory employed in bankruptcy cases to prevent the unfair diminution of a bankrupt's estate.

## III. Analysis

### A. *Jurisdiction*

This Court has addressed jurisdiction over the FDIC in this situation in the companion case of *MCorp v. Clarke*, 755 F.Supp. 1402, in a Memorandum Opinion and Order filed February 1, 1991. As discussed in that opinion, the Court believes this suit to be grounded in the National Bank Act, and therefore subject to scrutiny under the Administrative Procedure Act (APA), which generally governs whether a federal agency may be immune from suit regarding certain activities.

■ Suits may proceed against federal agencies such as the FDIC under the APA where (1) no statute exists to preclude judicial review, (2) the action is "committed to agency discretion by law," and (3) where the relief sought is of a form other than money damages. 5 U.S.C. § 701, 702. In the situation at bar, this Court has found that these criteria have been met.

■ First, the statute the FDIC champions as precluding judicial review, FIRREA § 212(j), Pub.L. No. 101–73, 103 Stat. 183 (1989), was not enacted until August 9, 1989, nearly five months after the contested events in this litigation. While procedural in nature, FIRREA § 212(j), if retroactively imposed, would unfairly subject the Plaintiff to an unanticipated denial of jurisdiction against the FDIC as Receiver, and thus would constitute "manifest injustice." *Yegen Associates, Inc. v. F.S.L.I.C.*, No. CA3–89–0684–R, slip op., 1989 WL 225019, Lexis 16097 (N.D.Tex. Sept. 25, 1989).

---

**6.** The FDIC Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Nov. 16, 1989, at p. 4.

Second, the actions of the FDIC in its denial of fair and equal treatment of creditors of MBank Dallas are not actions "committed to agency discretion by law." 5 U.S.C. § 701(a). By knowingly ignoring the National Bank Act's edict to treat all creditors ratably, the FDIC engaged in an action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A). Actions of this type do not qualify as discretionary under the APA.

Third, this suit is not one where the Plaintiff seeks money damages. MBNB asks for the return of its $17.1 million, a specific remedy that can be characterized as equitable relief. *Texas American Bancshares, Inc. v. Clarke*, 740 F.Supp. 1243, 1248 (N.D.Tex.1990); *Bowen v. Massachusetts*, 487 U.S. 879, 895, 108 S.Ct. 2722, 2732–33, 101 L.Ed.2d 749 (1988). Therefore, federal jurisdiction of this suit is not precluded by sovereign immunity under the APA.

■ Even if this cause of action were construed, as the FDIC prefers, as a tort, and thus subject to the strictures of the Federal Tort Claims Act (FTCA), federal jurisdiction would still be appropriate. The FDIC's actions here cannot be construed as a discretionary policy judgment that is immune from suit. Rather, the actions at issue more squarely fit into the category of operational conduct that is subject to suit. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *see Gaubert v. United States*, 885 F.2d 1284 (5th Cir.1989), *rev'd*, —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *FDIC v. Mmahat*, 907 F.2d 546, 552 (5th Cir.1990).

While the Supreme Court disagreed with the Fifth Circuit's ruling that the actions of the FDIC in *Gaubert* fell within the scope of operational conduct, rather than discretionary policy, the activities of the FDIC in the case at bar are quite dissimilar from its conduct in *Gaubert*. In *Gaubert*, the Supreme Court stated that "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an

employee to follow,' because 'the employee has no rightful option but to adhere to the directive.' " *Gaubert*, —— U.S. at ——, 111 S.Ct. at 1273, 113 L.Ed.2d at 346 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988)).

"Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. *See Dalehite [v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)], supra, at 36 [73 S.Ct. at 968]. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to public policy."

*Gaubert*, —— U.S. at ——, 111 S.Ct. at 1274, 113 L.Ed.2d at 347. In the situation at bar, the FDIC did not act within its parameters, which would have entitled it to protection under the discretionary function exception. Rather, the FDIC expressly violated a mandatory regulation, the National Bank Act, in refusing to reimburse MBank creditors of the failed MBank Dallas and MBank Houston at the same rate as non-MBank creditors of those two institutions. *See MCorp v. Clarke; MBank New Braunfels v. FDIC*, 721 F.Supp. 120 (N.D.Tex.1989).

■ Jurisdiction exists only, however, to the FDIC, in both its capacities. The Deposit Insurance Bridge Bank, created expressly by the FDIC as a short-term manager for the MBanks declared insolvent, has been sold to Bank One. Any suit against this institution for its FDIC-controlled conduct is therefore moot.

### B. Standard for Summary Judgment

■ The motions presented in this case are motions by both the Plaintiff and Defendant for summary judgment and a motion by the Plaintiff to dismiss or grant summary judgment upon the Defendant's counterclaim. In a motion to dismiss, a

court must decide whether the nonmovant's position is supported by the law. Therefore, it reviews only the pleadings made by the parties. Summary judgment, instead, focuses on whether a genuine issue of material fact exists that would necessitate a trial. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). Therefore, in considering summary judgment motions, a court must look to the factual evidence submitted by the parties, as well as the arguments of their pleadings.

The Defendant's counterclaim contends that the $46.9 million payment from MBank Dallas to MBNB on March 27, 1989, was an illegal preference, and that such a payment violates the concept of equitable subordination. While the Court views the equitable subordination issue as one capable of being decided based on the law alone, the issue of whether the payment constituted a preference presents a mixed question of law and fact. Therefore, the Court has considered the Plaintiff's motion to dismiss the Defendant's counterclaim as a motion for summary judgment, rather than a motion to dismiss, and has accordingly examined the evidence presented in connection with this motion.

■ The party defending against a motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–7, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). In the case at bar, after making an independent examination of each motion and the evidence presented, the Court finds no genuine issue of material fact exists. Summary judgment is therefore appropriate. The Court next considers the parties' contentions as to the merits of the case.

## C. *The National Bank Act*

■ MBNB alleges that the decision of the FDIC that it should be paid only the liquidation value of its claim, while other creditors were reimbursed in full, violates the National Bank Act, 12 U.S.C. §§ 91, 194. Section 91 of this act prohibits payments "made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another...." Section 194, governing the distribution of a bank's assets after insolvency, provides that the Comptroller of the Currency, who sits on the FDIC board, "shall make a ratable dividend of the money paid over to him by such receiver on all such claims as may be proved to his satisfaction or adjudicated in a court of competent jurisdiction...." This law was construed in *White v. Knox*, 111 U.S. 784, 786, 4 S.Ct. 686, 686, 28 L.Ed. 603 (1884), as holding that "[a]ll creditors are to be treated alike." *See First Empire Bank v. FDIC*, 572 F.2d 1361 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538 (9th Cir.1987); *Texas American Bancshares; Senior Unsecured Creditors' Committee of First RepublicBank Corp. v. FDIC*, 749 F.Supp. 758 (N.D.Tex.1990).

The FDIC urges the Court to look to the facts of *White v. Knox*, claiming that applying that holding to the case at bar would limit MBNB to recovery of the liquidation value of its claim. In *White v. Knox*, creditor White was owed approximately $60,000 by the insolvent Miners' National Bank of Georgetown, Colorado. The Comptroller of the Currency refused to recognize White's claim, so White brought suit. Eight years later, a court awarded White a judgment of more than $104,000. The Comptroller contested the judgment. He had granted other creditors of the bank 65 percent of the amount each claimed at the time of the bank's failure. He thus believed White should receive 65 percent of his original claim, approximately $46,500, rather than 65 percent of the judgment, $67,000, to which White believed he was entitled. The Supreme Court limited White's recovery to the $46,500 figure, reasoning that, since all creditors should be treated alike, White should be given the value he would have received had his claim been recognized at

the same time as the claims of the other creditors.

A careful reading of *White v. Knox* thus does not conflict with the arguments advanced by MBNB in this case, particularly considering the intervening establishment of the FDIC and its Insurance Fund. MBNB seeks to be placed on the same footing as other creditors of MBank Dallas. Although the FDIC decided it could grant each creditor only 80 percent of his claim out of the receivership estate, the claims of non-MBank creditors were satisfied in full through augmentation by the FDIC Insurance Fund. MBNB, however, was denied this equal treatment.

The FDIC admits that federal law governs the distribution of a failed bank's assets once the bank is placed into receivership, citing *Downriver Community Federal Credit Union v. Penn Square Bank*, 879 F.2d 754, 759–60 (10th Cir.1989), as support for the FDIC's actions at bar. The *Downriver* case, though, simply holds that the National Bank Act's rule of equal treatment applies to distribution of assets by the FDIC as Receiver. *Downriver*, at 761–62;[7] *see Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1407 (10th Cir.1984); *Atlantic Gypsum Co. v. Federal Nat'l Bank*, 76 F.2d 59, 60 (1st Cir.1935).

### D. *MBNB's Constitutional Claims*

MBNB also contends that the FDIC's denial of full payment equal to that received by other creditors violates its rights under the Due Process Clause and the Just Compensation Clause of the 5th Amendment of the U.S. Constitution. The Court believes the National Bank Act adequately addresses MBNB's contentions.

Further, as explained herein, precedent holds the Just Compensation Clause inapplicable to MBNB's situation. The Just Compensation Clause states "... nor shall private property be taken for public use, without just compensation." 5th Amendment, U.S. Constitution. A broad interpretation would consider even something fungible, such as money, to be private property worthy of just compensation. The Declaration of Taking Act, however, which deals with compensation for property taken by eminent domain, speaks only of lands, easements or rights of way. 40 U.S.C. § 258a. Cases decided by the federal courts regarding the U.S. government's exercise of eminent domain have dealt overwhelmingly with land use, zoning rights, and distinctive tangible property. *See, e.g., United States v. Sperry Corp.*, 493 U.S. 52, —— n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290, 303 n. 9 (1989). The Court finds no support, nor has Plaintiff MBNB cited any, that would lead it to regard money held in bank accounts as private property entitled to just compensation under the 5th Amendment.

The Court also finds a lack of support for MBNB's Due Process claim. Here, the 5th Amendment declares that a person shall not "... be deprived of life, liberty, or property, without due process of law." In the instance of action taken by a federal administrative agency, this clause has been held to require a hearing at some point before the agency's decision is made final.[8]

The Court has not been informed of any hearings held by the FDIC regarding the contested federal funds. MBNB filed suit in this Court on April 26, 1989, and moved

---

**7.** In *Downriver,* uninsured depositors charged they had been misled by false financial statements into purchasing certificates of deposit with the Penn Square Bank, N.A., at a time when officers of the bank knew or should have known the bank was in danger of insolvency. The dissatisfied depositors could not recover more than a ratable share of the liquidation value of the bank, however, the court ruled, because other depositors had received no more on their claims that exceeded the $100,000 FDIC insurance level. The situation in *Downriver* differs from the facts at bar—here, some creditors were reimbursed in full, while MBNB and other

MBank creditors were denied equal benefit from the FDIC Insurance Fund.

**8.** The Supreme Court has ruled that a delay in notice or hearing is not a denial of due process in certain instances where the government's paramount interest is protecting the public. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Bank failure has been ruled to be one of those areas. *Coffin Bros. & Co. v. Bennett*, 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928).

for an injunction to regain control of the $17.1 million. That motion was denied. The FDIC's structure, however, appears such that an impartial hearing may have been impossible. The various roles played by the FDIC in the MCorp situation were so intertwined, and administrative decisions made at such a high level, that the agency likely could not have separated into advisory, watchdog and adjudicative branches. No evidence was put forth in this case, though, that the FDIC's administrative procedures were faulty. Therefore, the Court declines to rule on the issue of due process.

### E. *Creation of a Constructive Trust*

The Plaintiff MBNB also claims that the FDIC's refusal to return its federal funds loans entitles it to an equitable remedy in the form of a constructive trust. MBNB contends that Texas state law should be applied in reaching this result. Although the funds at issue were lent between two banks located in Texas, both institutions were national banks, subject to regulation under federal law. Also, this case turns on a point of federal law, the National Bank Act. For those reasons, Texas state law should not come into play in this action.

### F. *Existence of a Preference Payment*

1. Evidence to indicate a preference

The FDIC claims it should be awarded the $46.8 million that MBNB withdrew on March 27, 1989, one day before MBank Dallas was declared insolvent, on the basis that the transfer of funds was in contemplation of MBank Dallas' insolvency. As evidence of this intent the FDIC points to a memo written by MBNB Chairman and CEO Joe Seibold that notes a conversation on March 27 between Seibold and an MCorp official, regarding the continued loan of federal funds to MBank Dallas.

The memo, which Seibold stated was written to himself,[9] reported a telephone conversation between Seibold and Peter Bartholow, an officer of MCorp and an employee of the subsidiary MCorp Management. In the memo, Seibold wrote that Bartholow called him to respond to a question about MBNB seeking legal advice from a law firm serving MBank Dallas.[10] The memo states that after advising Seibold that MBank Dallas' law firm could no longer aid MBNB, due to a conflict of interest, Bartholow and Seibold spoke about MBNB's federal funds transactions with MBank Dallas. The memo states that Bartholow did not recommend either that MBNB pull its federal funds out of MBank Dallas or that MBNB continue the federal funds relationship. The memo does say, though, that "Bartholow advises that any intanglements [sic] should be severed promptly and if possible, effective March 27, 1989."[11]

Bartholow, in a deposition taken by the FDIC,[12] said he remembered calling Seibold

9. Deposition of Joe T. Seibold, June 20, 1989, at p. 108. Although this deposition was not placed in evidence in this case, it was included along with the FDIC's exhibits in the companion case of *MCorp v. Clarke,* CA3–89–0831–F, also in this Court. *See* 755 F.Supp. 1402. The deposition is pertinent to the case at bar, directly addressing MBNB's actions on March 27 and 28, 1989. The Court presumes the parties' failure to include it among the exhibits in this case is, based on the volume of evidence presented, merely an oversight.

10. *See also* Deposition of Joe T. Seibold of June 20, 1989, at p. 106–07.

11. The memo reads, in pertinent part:
"3. Bartholow was not issuing instructions to change our position in respect to fed funds sold nor was he instructing me to maintain the relationship.

"4. 'Standstill agreement' was nullified by the bankruptcy filings.
"5. The maintaining of fed funds in accordance with the 'standstill agreement' and/or other agreements with regulators does not represent an imprudent act and/or creat [sic] a position of liability for the directorate. This information is based on legal counsel received from other sources and representing other banks.
"6. Bartholow advised that any intanglements should be severed promptly and if possible, effective March 27, 1989.
"7. Bartholow advised that the decision was solely that of the management of MBank New Braunfels. However, Capital Markets and other as appropriate would be advised that changes might be undertaken."

12. April 24, 1990.

on March 27, but said he did not give Seibold any opinions about the validity of the Standstill Agreement or intra-company funding.[13] Bartholow stated that he had spoken with James Gardner, chief executive officer of MBank Dallas, earlier that morning.[14] Bartholow said he did not know anything about MBNB's interest in reclaiming its federal funds until the afternoon, when Seibold called and told him MBNB had demanded and obtained its overnight federal funds from MBank Dallas, and also had demanded, but had not receive, its term federal funds.[15] Later that afternoon, Bartholow said, he learned that other MBanks had also made demands for federal funds on MBank Dallas.[16] The FDIC seeks to use these conversations of March 27 to imply that the $46.8 million payment to MBNB was instigated at the behest of MCorp, and that it is therefore an illegal preference.

■ The National Bank Act, 12 U.S.C. § 91, prohibits all transfers made "after the commission of an act of insolvency, or in contemplations thereof" that are made with a view to prevent the ratable distribution of the bank's assets, as required by 12 U.S.C. § 194. In applying § 91, a court must first consider what the statute means by the term "insolvency." "The insolvency of the Bank Act is *commercial* insolvency," where a bank cannot carry on its ordinary course of business, satisfying the demands of depositors and creditors. *Kullman and Co. v. Woolley*, 83 F.2d 129, 131–32 (5th Cir.1936); *see Aycock v. Bradbury*, 77 F.2d 14 (10th Cir.), *cert. denied*, 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed. 416 (1935); *Bender v. Etnier*, 26 F.Supp. 484, 487 (M.D.Pa.1939); *Willing v. Eveloff*, 94 F.2d 344, 346 (3rd Cir.), *cert. denied*, 305 U.S. 611, 59 S.Ct. 70, 83 L.Ed. 389 (1938).

As the Tenth Circuit noted in *Downriver Community Federal Credit Union v. Penn Square Bank, supra,* a bank that has merely an on-paper insolvency, where

liabilities exceed assets, does not know for certain that it is insolvent until it is closed by the Comptroller of the Currency. Until such a declaration is issued, the bank must continue to satisfy the requests of depositors and creditors, as it is able, and may be presumed to be operating in the hope that its financial situation will improve. *Downriver*, 879 F.2d at 762. "It is a matter of common knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events." *McDonald v. Chemical National Bank*, 174 U.S. 610, 618, 19 S.Ct. 787, 790, 43 L.Ed. 1106 (1899).

■ The FDIC contends that MBank Dallas officials knew the bank would soon become insolvent at the time they authorized payment of the $46.9 million to MBNB. In support, the FDIC cites *Pearson v. Durell*, 77 F.2d 465 (6th Cir.), *cert. denied*, 296 U.S. 606, 56 S.Ct. 122, 80 L.Ed. 429 (1935), a case in which payments to creditor banks made the day before insolvency was declared were ruled to be preferential. The Court believes *Pearson* is distinguishable from the situation at bar.

In *Pearson*, the Holston–Union National Bank of Knoxville, Tennessee, was controlled by stockholders who also owned The Bank of Tennessee, in Nashville. When the stockholders' holding company became insolvent, depositors of the Holston–Union bank began to fear their bank might soon be closed. The holding company was placed in the hands of a bankers' committee on Tuesday, November 4, 1930, and this news was swiftly published in the Knoxville papers. Holston–Union depositors began a run of withdrawals, such that by Sunday, November 9, the bank's board of directors decided to seek help from the Federal Reserve. The governor of the Federal Reserve Bank in Atlanta refused the Holston–Union bank's request. The next

**13.** Deposition of Peter B. Bartholow, Volume II, at pp. 35–7, 41–51.

**14.** *Id.* at pp. 27–9, 37.

**15.** Bartholow Deposition, Volume II, at p. 61. *See also* Deposition of Joe T. Seibold of June 2, 1989, at p. 45.

**16.** *Id.* at p. 63.

morning, depositor Durell sought, through another Knoxville bank, to withdraw his entire balance of some $50,000 from the Holston–Union bank. The check went through a clearinghouse, where it was discovered that the Holston–Union bank owed amounts of more than $100,000 each to yet two other Knoxville banks. These banks pressed Holston–Union for their funds. Although Holston–Union had insufficient funds in hand and knew none were forthcoming from the Federal Reserve, it raided its Federal Reserve account to pay these debts before the close of business. The bank never reopened.

*Pearson* differs from the case at bar in several regards. First, the Holston–Union bank had been turned down for help by the Federal Reserve before the bank opened that last day. Here, MBank Dallas had been given a borrowing limit on March 27, 1989, of $98 million at the Federal Reserve. Additionally, it was allowed to borrow up to $78 million on March 28. Second, the Holston–Union bank could clearly see insolvency approaching. Its board met on a Sunday to seek solutions to the impending crisis, and by Tuesday it independently decided to suspend business. With MBank Dallas, the situation was far foggier. The bank had been operating with a paper insolvency since at least September 30, 1988. It remained open, however, pursuant to a pact between MCorp and the FDIC: The FDIC's condition for providing help to MCorp and seeking a new buyer for its banks was that the MBanks continue a round-robin of federal funds loans that would force the healthier banks of the group to shore up the sickly members. This "Standstill Agreement," as the FDIC labeled it, turned out to be part of the FDIC's scheme to weaken those healthy banks enough that the insolvency of one or

two major MBanks could, domino-like, produce the collapse of the entire group. *See MCorp v. Clarke*, 755 F.Supp. 1402.

Although the MBank Dallas management knew the bank was in precarious financial condition, the bank had not been officially declared insolvent. The Office of the Comptroller of the Currency (OCC) had stationed employees physically at the MBank Dallas money desk to monitor the bank's liquidity since the middle of 1988.[17] These employees, Jeris Hager and Stephen Sage, along with employees from the FDIC and the Federal Reserve, held daily "liquidity committee" meetings with MBank Dallas officials. The OCC became so convinced that MBank Dallas lacked viability that, in a document titled "Banking Update," dated February 17, 1989, it reported that MBank Dallas, along with four other MBanks, had been insolvent as of September 30, 1988. With no formal declaration of insolvency, however, MBank Dallas was compelled to continue business as usual until it was confronted with the type of situation presented March 27 and 28, 1989, where it had insufficient liquidity to meet demands from creditors.

To find a preference the law looks to the intent of the transferor, not the transferee. *Kullman and Co. v. Woolley*, 83 F.2d 129, 132 (5th Cir.1936); *Pearson v. Durell*, 77 F.2d 465, 467 (6th Cir.), *cert. denied*, 296 U.S. 606, 56 S.Ct. 122, 80 L.Ed. 429 (1935); *Aycock v. Bradbury*, 77 F.2d 14, 17 (10th Cir.), *cert. denied*, 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed. 416 (1935).[18]

However, where the transferee is an insider, someone with close connections to the transferor, courts tend to scrutinize the relationship between the two. The insider's supposed clout with the transferor can lead a court to determine that the payment would not have been made but for this

---

**17.** Jeris Hager began monitoring the MBank Dallas money desk in April 1988. Stephen Sage joined her in June of that year. Angela Szyndel of the Federal Reserve also was stationed at the money desk starting in mid–1988. Sherwin R. Koopmans, assistant director of the FDIC's Division of Bank Supervision, said in his deposition that he personally became involved in the day-to-day monitoring of all the MCorp banks around November 1, 1988.

**18.** "[The transferee's] knowledge or the lack of it is immaterial. If the transfer was made in contemplation of insolvency and with a view to creating a preference, it was void quite apart from his knowledge of the insolvent condition of the bank. The statute makes it so." *Aycock v. Bradbury*, 77 F.2d at 17.

special relationship. That, then, is interpreted as a preference, with the intent to prefer imputed to the transferor, in this case MBank Dallas. *FDIC v. Goldberg*, 906 F.2d 1087 (5th Cir.1990); *see Mechanics Universal Joint Co. v. Culhane*, 299 U.S. 51, 57, 57 S.Ct. 81, 84, 81 L.Ed. 33 (1936).

Even if the FDIC could show that Bartholow or other MCorp officials persuaded MBNB to press MBank Dallas for its federal funds, a preference would not be found. The key finding necessary to create a preference is the intent of MBank Dallas: If MBank Dallas intentionally favored MBNB at the same time it denied payment to other creditors, a preference would be found.

The facts presented do not indicate that MBNB was so favored. Darla Wisdom, an employee on the MBank Dallas money desk, stated in her deposition that MBNB made its request for the overnight federal funds on March 27 by wire.[19] She remembered that the request for the $46.8 million came before MBNB's request for $17.1 million in term federal funds, and also prior to a request for $167 million from MBank MidCities.[20] Eugene Barham, her colleague on the MBank Dallas money desk, likewise recalled that this demand from MBNB came first.[21]

MBank Dallas CEO James Gardner affirmed in an affidavit that MBank Dallas had limited borrowing capacity from the Federal Reserve at that time—$98 million available on March 27 and $78 million available on March 28. Satisfying the demands of all creditors, MBank or non-MBank, made those two days would have been impossible, with the bank becoming insolvent part-way through. Also, Gardner said he realized that satisfying only a few demands would have constituted a preference toward those banks being paid.[22]

Gardner stated in his deposition that he did not know of MBNB's request for $46.9 million and the money's release until some time after these events had occurred.[23] Eugene Barham, however, said he had sought and received instructions from Gardner on whether to release the $46.9 million shortly after the request came in.[24] Darla Wisdom also stated she recalled Barham seeking Gardner's advice.[25] After the $46.9 million was paid to MBNB, MBank Dallas officers began discussing what course of action to take regarding any other affiliate demands for federal funds that might arise, according to James Monroe.[26]

While MBank Dallas officials said it was unusual for a bank to withdraw all its overnight federal funds the next business day, they did not regard it as a red-flag situation. Term funds were different. Wisdom stated in her deposition that "[i]n a normal course of business, whether an affiliate or a correspondent, we [the MBank Dallas money desk] will not terminate term fed funds."[27] However, the five contracts for the term federal funds at issue, contracts signed by both Joe Seibold of MBNB and by Wisdom, state: "It is understood

---

**19.** FDIC's Deposition of Darla Wisdom, April 4, 1990, at p. 19.

**20.** *Id.* at pp. 64, 82. Also, an attachment to Wisdom's Affidavit of June 23, 1989, displays what Wisdom said were notes handwritten by herself and Eugene Barham, another employee of the MBank Dallas money desk. These notes list the demands of six MBanks, including MBNB's demand for $17.1 million, made on MBank Dallas on March 27 and 28. The notes show a total of $502,305,000 in demands, none of which were satisfied.

**21.** Deposition of Eugene Barham, III, of April 11, 1990, at p. 108.

**22.** Affidavit of James B. Gardner, November 16, 1989, at p. 2. *See also* Deposition of James C. Monroe, Jr., at p. 94–5.

**23.** Deposition of James B. Gardner of June 4, 1990, at p. 35–6.

**24.** Barham Deposition at p. 71.

**25.** Wisdom Deposition at p. 21.

**26.** Deposition of James C. Monroe, Jr., of April 5, 1990, at p. 76. These discussions concerned only affiliate banks, Monroe said, because other creditor banks had so little money in MBank Dallas at the time that he considered any withdrawals by them would have an insignificant effect. Monroe deposition at p. 14. The evidence does not indicate that any outside creditor banks sought to retrieve funds from MBank Dallas on March 27 or 28, 1989.

**27.** *Id.* at p. 46–7.

that these funds are sold to us until further notice and may be withdrawn at any time."

The FDIC claims, however, that the MBanks were so intertwined and were so tightly controlled by their holding company that MCorp itself was both transferor and transferee.[28]

None of the evidence presented shows any intent on the part of MBank Dallas to favor MBNB. Also, the FDIC has failed in its efforts to prove that MBNB was an insider of MBank Dallas, such that it could obtain preferred treatment simply due to a close relationship with the payor bank.[29] Therefore, the Defendant FDIC has not demonstrated that the $46.9 million was paid to MBNB as a preference.

2. Contributions to Corporate Capital

■ The FDIC also claims that the funds sought by MBNB were not truly funds belonging to MBNB, but rather contributions to MCorp's corporate capital. The FDIC thus seeks to advance a theory that all the MBanks were members of a unitary banking system and that therefore the FDIC was justified in paying MBank creditors of MBank Dallas no more than they would have received in a straight liquidation.

The FDIC relies upon *In re Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980), for the proposition that loans from a source connected to the company may actually be contributions to capital if (1) the company is undercapitalized such that a financial analyst determines it cannot carry on its business without aid, and (2) if the loans were made at a time when the company could borrow money nowhere else. *Multiponics* at 717.

The situation at bar meets neither of the *Multiponics* criteria. First, the financial analysts expressly entrusted with overseeing the solvency of national banks, the FDIC and the OCC, had determined that MBank Dallas should remain open until the evening of March 28, 1989. Therefore, while the FDIC may contend that MBank Dallas was so undercapitalized that it should not have been doing business in late 1988 and early 1989, the responsibility for such a condition lies with the FDIC, which, based on its monitoring of the situation, could have pulled the plug at any time. Second, MBank Dallas, until the Federal Reserve called its loan on the evening of March 28, 1989, had been able to borrow money from sources other than its fellow MBanks. It is unknown if MBank Dallas could have borrowed enough elsewhere that it would have been able to thrive without loans from other MBanks. This is unknown because the FDIC itself, in exchange for a promise to search for ways to help the troubled MBanks, demanded that MCorp's banks adhere to the Standstill Agreement, which required that federal funds transactions between the MBanks continue.

The Court therefore does not find merit in the FDIC's argument that MBNB's federal funds loans to MBank Dallas were contributions to MCorp corporate capital.

3. Equitable subordination

■ The Defendant FDIC also urges the Court to apply the principles of equitable subordination to this case and find that MBNB's claim should be placed in a position inferior to other creditors of MBank Dallas. Equitable subordination is primarily a creature of bankruptcy litigation and the Fifth Circuit has considered it an "extraordinary remedy," open to narrow interpretation. *In the Matter of CTS Truss, Inc.*, 868 F.2d 146, 148 (5th Cir. 1989). The FDIC directs the Court to several cases in which other courts have applied equitable subordination to non-bankruptcy situations. *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F.2d 561, 568 (5th Cir.1986); *S.E.C. v. American Board of Trade*, 719 F.Supp. 186, 195–96

---

**28.** Opposition to Counterdefendant's Motion for Dismissal or Summary Judgment, filed January 2, 1990, at p. 17.

**29.** Also, the fact that three of the federal funds loans comprising the $17.1 million were made March 27, 1989, the day MBNB withdrew the $46.8 million in overnight federal funds, while not dispositive, tends to negate the possibility that MBNB withdrew the $46.8 million in contemplation of MBank Dallas' imminent insolvency.

(S.D.N.Y.1989); *Credit Managers Ass'n of Southern Cal. v. Federal Co.*, 629 F.Supp. 175, 189 (C.D.Cal.1985). To make such an application, however, the Court must find that the parties meet the three prongs of the equitable subordination test: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claims must not be inconsistent with the provisions of the Bankruptcy Code." *In the Matter of Clark Pipe & Supply Co., Inc.*, 870 F.2d 1022, 1027 (5th Cir.1989), *op. withdrawn, substituted op.* 893 F.2d 693 (5th Cir.1990), (citing *Matter of Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir.1983)).

This Court addressed equitable subordination at length in its opinion in *MCorp v. Clarke*, concluding that the MBanks' situation did not warrant the application of the principles of equitable subordination. *MCorp v. Clarke*, 755 F.Supp. at 1416–17. As discussed above, the FDIC has not shown that MBNB has engaged in any inequitable conduct that has conferred upon it unfair advantage or injured other creditors. The FDIC's counterclaim contending that MBNB received a preference payment and should be held accountable under the rules of equitable subordination is therefore DENIED.

## IV. Relief

MBNB seeks relief in the form of the monies owed to it by MBank Dallas that the FDIC had ordered withheld. That sum is $17.1 million. The Court hereby orders the parties to more fully brief the issue of relief, including whether interest should be awarded on any sum granted. Briefs shall be limited to 25 pages. The Plaintiff's brief shall be filed on or before August 12, 1991. The Defendant's response shall be filed within 20 days of the file-stamped date of the Plaintiff's brief. No issues relating to the liability questions discussed in this Memorandum Order and Opinion shall be included in these briefs.

The Court shall, through a subsequent order, schedule a hearing, confined solely to the issue of relief, before Magistrate William F. Sanderson, Jr.

SO ORDERED.