**BANK ONE, TEXAS, N.A., Plaintiff–Counterdefendant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Counterplaintiff.**

No. CIV. A. 3:92–CV–0535–D.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 10, 1998.

Education Code Ann. § 33.082(a) (Vernon 1996).

Michael P. Lynn (argued), Steven H. Stodghill, Eric N. Whitney, Lynn Stodghill Melsheimer & Tillotson, L.L.P., Dallas, TX, for Plaintiff-Counterdefendant.

Dennis S. Klein (argued), Robert B. Funkhouser, M. Kathleen O'Connor, Roberta Koss, Hughes Hubbard & Reed LLP, Washington, DC, Frederic A. Ortiz, F.D.I.C.-Legal Div., Dallas, TX, for Defendant-Counterplaintiff.

FITZWATER, District Judge.

The principal question presented by the parties' motions for summary judgment is who owns—as between plaintiff-counterdefendant Bank One, Texas, N.A. ("Bank One") and defendant-counterplaintiff Federal Deposit Insurance Corporation ("FDIC")—the furniture, fixtures, and equipment ("FF & E") at issue in this litigation.

I

The background facts of this lawsuit are set out at length in *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943 (N.D.Tex.1995) ("*Bank One I*"), and *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 939 F.Supp. 533 (N.D.Tex.1996) ("*Bank One II*").[1] The court assumes familiarity with these decisions and adds to the factual discussions the facts and procedural history necessary to understand today's opinion.

A

The focus of the court's decision in *Bank One I* was on the right to recover liquidated damages from several million dollars of certificates and proceeds (the "MCar Assets") that were pledged to secure the performance of MBank Dallas, N.A. ("MBank") under the First Amendment to the Lease ("Lease"). Pursuant to the Lease, MBank leased the FF & E from Capital Associates International, Inc. ("Capital") as part of a sale-leaseback transaction in which MBank sold the FF & E

---

1. The court has abbreviated the caption in this case to reflect only the two parties who remain.

This case is the same as *Bank One I* and *Bank One II*.

to Capital, who simultaneously leased the FF & E back to MBank and its parent corporation. Capital largely financed its part of the transaction by borrowing from The Prudential Insurance Company of America ("Prudential"), who took a security interest in the FF & E, MCar Assets, and relevant transactional documents. In concluding that Capital and Prudential obtained the right to recover liquidated damages from the MCar Assets, the court held:

> The transaction was structured so that MBank and, in turn, the FDIC–Receiver and any successor bank obtained *complete and unfettered* ownership and use of the FF & E. In other words, but for the loss of the MCar Assets—a circumstance to which the court will turn below—the FF & E Lease was drafted so that when the FDIC took over as receiver, it obtained all the FF & E located on the failed bank's premises as if there had been no sale-leaseback transaction, and was able to convey it to the bridge bank.

*Bank One I,* 878 F.Supp. at 965 (emphasis in original).

Bank One later argued that this holding was *dicta,* and challenged the FDIC's ownership of the FF & E. In *Bank One II* the court rejected Bank One's position and held that "MBank, and, in turn, the FDIC, obtained complete and unfettered ownership of the FF & E upon MBank's insolvency." *Bank One II,* 939 F.Supp. at 539. The court also concluded that "the FDIC obtained ownership of the FF & E when it became MBank's receiver." *Id.* at 541. The court granted the FDIC's summary judgment motion dismissing count two of Bank One's amended complaint, and "declar[ed] that when the FDIC was appointed as MBank's receiver, it obtained complete and unfettered ownership of the FF & E[.]" *Id.* Therefore, the court held that the FDIC was entitled to recover from Bank One, as a tenant at will, the reasonable rental value of the FF & E, in an amount to be determined at trial. *Id.* at 535, 543.

Following the court's decision in *Bank One II,* Bank One moved to reinstate its declaratory judgment action (count two of its amended complaint), which the court had dismissed. *Id.* at 541. This request followed a dispute that arose between the parties concerning whether Bank One was precluded by the court's rulings from challenging the FDIC's assertion of ownership of the FF & E as a component of its counterclaims for unpaid rent and conversion. The court denied Bank One's motion to reinstate because "Bank One did not fairly raise the argument now presented as part of the declaratory judgment action that the court dismissed on September 26, 1996." Apr. 28, 1997 Order at 2. The court also concluded that "[a]s a defense to the FDIC's claims for unpaid rent and conversion, however, the argument is not foreclosed .procedurally. Because Bank One's position is not in the nature of an affirmative defense, it need not have been pleaded as such." *Id.*

The FDIC and Bank One moved anew for summary judgment, presenting once more the issue of ownership of the FF & E. The focus of the case now became certain sections of the Purchase and Assumption Agreement ("P & A Agreement"), by which the FDIC had transferred all deposits and certain liabilities and assets from the MBank receivership estate to the newly-created Deposit Insurance Bridge Bank ("DIBB"), which was later renamed Bank One.[2] In § 3.1($l$) the FDIC transferred "Fixtures owned by [MBank] associated with Owned Bank Premises or Leased Bank Premises," and in § 3.1(m) it conveyed "Furniture and Equipment owned by [MBank] associated with Owned Bank Premises or Leased Bank Premises."

The FDIC argued that Bank One was precluded by the doctrine of the law of the case from asserting that it owned the FF & E pursuant to the P & A Agreement, after having taken the position earlier in the litigation that it did not. In rejecting this argument, the court noted that it "ha[d] yet to decide explicitly whether the FDIC sold the

---

**2.** In July 1989 DIBB was renamed Bank One. See *Bank One II,* 939 F.Supp. at 536. For clari- ty, the court will refer to DIBB as "Bank One."

FF & E to Bank One pursuant to § 3.1 of the P & A Agreement." July 30, 1997 Mem. Op. at 3. The court also explained the scope of its prior opinions in the case.

> Bank One II primarily involved the parties' disputes concerning how the court's decision in Bank One I should be interpreted and applied; the effect of legal positions that the FDIC had asserted prior to entry of that ruling; and the effect of transactions and acts concerning the FF & E and the equipment lease ("Lease") that had occurred after March 29, 1989, particularly the FDIC's attempt to repudiate the Lease on September 13, 1989 and Bank One's agreement to purchase the FF & E from Capital Associates International, Inc. ("Capital"). See, e.g., Bank One II, 939 F.Supp. at 537–38, 541. The FDIC presented the § 3.1 issue as an alternative claim for relief in count three of its counterclaim, contending that Bank One was liable for the book value of the FF & E. The court did not reach this cause of action, however, and assumed it was moot. See id. at 543. Although the court reiterated the holding of Bank One I that the FDIC "obtained complete and unfettered ownership and use of the FF & E," id. at 541, and relied on that holding as a predicate for concluding that Bank One owed unpaid rent as a tenant at will, id. at 542–43, "the court's substantive rulings are necessarily the product of the issues and arguments presented, [and] the holdings of prior opinions—regardless of their breadth—must be [understood] in their proper context." Apr. 28, 1997 Order at 2 (footnote omitted). The court did not explicitly address the § 3.1 question in deciding the rent issue.

Id. at 3–4. The court also rejected the assertion that it had "decide[d] by necessary implication that the FDIC had not sold Bank One the FF & E." Id. at 4.

> The holding in Bank One II that the FDIC had complete and unfettered ownership and use of the FF & E followed inexorably from Bank One I. See Bank One II, 939 F.Supp. at 539. The ownership decision in Bank One I was based on the assumption that the Lease terminated as of the time the Office of the Comptroller of the Cur-

rency ("OCC") declared MBank insolvent. See Bank One I, 878 F.Supp. at 967 (stating that the court is "deciding these motions on the basis of the OCC's declaration of MBank's insolvency"). This assumption was sufficient to support the court's rulings on the motions then before it. See id. at 949 n. 10 (noting that court had no reason to resolve "whether the declaration of insolvency occurred during the late hours of March 28 or the early hours of March 29"). In Bank One II the court held that the FDIC became the owner of the FF & E at the time of its appointment as receiver. Bank One II, 939 F.Supp. at 543. This was an adequate basis on which to award the FDIC rent from Bank One as a tenant at will. In the absence of a § 3.1 defense in Bank One II, the court had no reason to decide, and thus did not implicitly resolve, whether MBank owned the FF & E when it closed for business on March 28, 1989.

Id. at 4–5.

The court approved Bank One's efforts to establish ownership of the FF & E, so long as they were advanced as a defense and not as an affirmative claim for declaratory judgment. Id. at 5 n. 4 & 5–6. The court explained:

> This lawsuit has been on file since 1992, but it reached a watershed on March 16, 1995 when the court decided Bank One I. Until that juncture the FDIC's primary interest was in recovering the MCar Assets for the receivership estate and upholding its asserted right to disaffirm the Lease. The FDIC and Bank One had common litigation interests and were parties to a Joint Litigation Agreement. The court has recognized that "[p]rior to that opinion Bank One and the FDIC were sufficiently aligned that the FDIC had no incentive to develop discovery on matters that now remain to be litigated." May 13, 1997 Order at 1–2. After Bank One I was decided the FDIC altered its approach to the case, seeking to recover from Bank One for its use and alleged conversion of the FF & E. The court recognized the disparate nature of the first and second phases of the case in analyzing the effect

of the FDIC's pleadings that Bank One sought to enforce as binding judicial admissions. *See Bank One II,* 939 F.Supp. at 541. *Bank One II* represented the first substantive decision that directly addressed the FDIC's and Bank One's claims *inter se.* Like the FDIC did after *Bank One I,* when Bank One was unsuccessful in advancing certain positions in *Bank One II* it opted to change course, proffering a defense that had not been addressed by the court, that could still be raised, and that might succeed on the merits. This approach is proper.

*Id.* at 5–6.

In § 3.1 of the P & A Agreement, the FDIC transferred to Bank One certain fixtures, and furniture and equipment, that MBank owned. Because other clauses in the P & A Agreement defined the terms "fixtures" and "furniture and equipment" to mean those owned "as of Bank Closing," and because the term "Bank Closing" was defined to mean as of "the close of business of [MBank] on March 28, 1989," *see* July 30, 1997 Mem. Op. at 7, Bank One argued that MBank owned the FF & E and that the FDIC conveyed the FF & E to Bank One pursuant to § 3.1. The FDIC argued in opposition that it had established without genuine and material dispute that MBank did not own the FF & E at the time of MBank's closing, and therefore did not convey the FF & E.

The court denied Bank One's motion because there was no record evidence that would permit a reasonable trier of fact to find that MBank did not own the FF & E at the close of business on March 28, 1989 because insolvency did not occur until late March 28, 1989 or early March 29, 1989. *Id.* at 7. The court denied summary judgment in favor of the FDIC because the record contained evidence that the Office of the Comptroller of the Currency ("OCC") had declared MBank insolvent at the close of business on March 28, 1989. *Id.* at 9. The court also concluded that there was a genuine issue whether MBank committed pre-close-of-business *acts* of insolvency that triggered a change in the ownership of the FF & E. *Id.* at 8.

Following the court's July 30, 1997 memorandum opinion, the FDIC filed an August 14, 1997 cross-motion for reconsideration of the acts of insolvency ruling, contending that the court should hold that any pre-closing acts of insolvency that MBank committed did not present genuine issues of material fact. It asserted that as the basis for the court's analysis in *Bank One I* that a provable claim had been established, the court conclusively held that the Lease terminated as of the OCC's declaration that MBank was insolvent. It also argued that the parties to the Lease agreed in a settlement agreement that the declaration of insolvency rather than an act of insolvency was the event of default that triggered the Ipso Facto Clause; the parties waived any possible default based upon an act of insolvency; and Bank One, as a non-party to the Lease, lacked standing to challenge the contracting parties' determination of what constituted a default.

The court rejected these arguments. It held that it did not conclusively resolve in *Bank One I* whether that the Lease terminated on the OCC's declaration of insolvency. Oct. 8, 1997 Mem. Op. at 4. Although it decided in *Bank One I* that the Lease terminated "as of" the OCC's declaration that MBank was insolvent, it did not reach that conclusion by excluding acts of insolvency as triggering events. *Id.* at 3. The timing of MBank's insolvency was pertinent to the *Bank One I* decision in two relevant respects. First, it affected whether Capital and Prudential had provable claims to the MCar Assets. To be provable, the claims *inter alia* had to exist before MBank's insolvency. Capital's and Prudential's claims existed prior to insolvency because their rights of recovery against, and the liens upon, the MCar Assets arose pre-insolvency, even though they did not mature and accrue until the date of MBank's insolvency. It was not dispositive whether their claims matured and accrued upon an act or the declaration of insolvency. *Id.* (citing and quoting *Bank One I,* 878 F.Supp. at 954–55). Second, in *Bank One I* the timing of insolvency affected the FDIC's unenforceable penalty argument. The FDIC contended that if the court concluded that Capital's and Prudential's rights were triggered by acts of insolvency, the

liquidated damages provision that entitled them to recover Casualty Value from the MCar Assets was an unenforceable penalty. The court noted that although it rejected the penalty argument on substantive grounds, it held that because it was deciding the motions on the basis of the OCC's declaration of MBank's insolvency, it need not resolve whether the liquidated damages clause was an impermissible penalty in the context of acts of insolvency. *Id.* at 3–4 (citing and quoting *Bank One I,* 878 F.Supp. at 966–67).

The court disagreed with the FDIC's contention that the parties to the Lease had conclusively agreed that the declaration of insolvency, rather than an act of insolvency, was the event of default that triggered the Ipso Facto Clause, and had waived any possible default based on an act of insolvency. The court held insufficient the FDIC's citation of a Texas case for the proposition that a default in the performance of a contract may be waived. The court also rejected the FDIC's reasoning that addressed only whether parties to a contract may waive performance defaults, without attempting to explain how this rule affected the court's reasoning in *Bank One I* and *Bank One II* concerning the requisites of provable claims, particularly the court's conclusion that at the time of MBank's insolvency, the status of the parties was permanently fixed. *Id.* at 4 (citing *Bank One I,* 878 F.Supp. at 958; *Bank One II,* 939 F.Supp. at 540).[3]

The court also rejected the FDIC's challenge to Bank One's standing. The court held that if it were assumed that the Lease terminated when MBank committed an act of insolvency, that MBank acquired ownership of the FF & E prior to the close of business on March 28, 1989, and that the FDIC conveyed to Bank One the FF & E that MBank owned as of bank closing, then Bank One would have standing to challenge actions taken six years later by parties attempting to waive an event of default that affected its rights in a completed transaction. *Id.* at 4–5.

On September 2, 1997 the FDIC asked the court, by motion for reconsideration, to consider newly located evidence that it contended established that the OCC did not declare MBank insolvent until after the close of MBank's business on March 28, 1989. *Id.* at 5. The court concluded that the FDIC's motion for reconsideration was akin to a successive motion for summary judgment based on additional evidence. Because the court retained the discretion to consider such a motion, and in order to ensure fairness to Bank One, the court converted the motion to a successive motion for summary judgment and permitted Bank One to respond to it. The converted motion for reconsideration is now before the court for decision.

### B

As a result of the court's prior rulings, and to address arguments made by Bank One, the FDIC now asserts the following seven counterclaims: recovery of the reasonable rental value of the FF & E from Bank One as a tenant at will (count one); modification of the P & A Agreement (count two); reformation of contract (count three); conversion (count four); breach of contract (count five); unjust enrichment (count six); and *quantum valebant* (count seven).[4] Bank One asserts the following affirmative defenses: waiver, estoppel, limitations, termination of the January 1, 1990 Assistance Agreement ("Assistance Agreement"), failure to mitigate damages, amendment of the Assistance Agreement, and unclean hands.

In addition to the converted September 2, 1997 motion, which addresses the timing of the declaration of insolvency, the parties have filed other motions for partial summary judgment that address related and contingent claims and affirmative defenses that hinge on the court's resolution of the ownership issue. The FDIC's December 8, 1997 motion presents the question whether the FDIC is entitled to recover for breach of contract pursuant to the Assistance Agree-

---

3. The court did not suggest that the FDIC's waiver argument could not be squared with *Bank One I* and *II,* but it declined to analyze the issue on its own, in the context of a motion for reconsideration. Oct. 8, 1997 Mem. Op. at 4.

4. Counts five through seven are asserted as alternative counts.

ment.[5] Bank One has filed a December 30, 1997 motion in which it seeks judgment dismissing the FDIC's counterclaims for recovery of reasonable rental value and conversion. In a January 20, 1998 motion Bank One argues that it is entitled to dismissal of the FDIC's counterclaims for modification of the P & A Agreement and breach of contract. The FDIC has filed a February 13, 1998 motion in which it requests summary judgment as to Bank One's estoppel, failure to mitigate, and unclean hands defenses. Bank One has filed a May 13, 1998 motion for judgment on the FDIC's counterclaims for reformation, unjust enrichment, and *quantum valebant*.[6]

## II

Bank One contends that it is entitled to judgment as to the FDIC's counterclaims for reasonable rental value and conversion because it, rather than the FDIC, owns the FF & E. In deciding this issue, the court returns to where it began. In *Bank One I* the court held that "[t]he transaction was structured so that MBank and, in turn, the FDIC–Receiver and any successor bank obtained *complete and unfettered* ownership and use of the FF & E." *Bank One I*, 878 F.Supp. at 965 (emphasis in original). But it also concluded in the next sentence that "the FF & E Lease was drafted so that when the FDIC took over as receiver, it obtained all the FF & E located on the failed bank's premises as if there had been no sale-leaseback transaction, and *was able to convey it to the bridge bank*." *Id.* (emphasis added). The question the court must decide is whether the FDIC "convey[ed] [the FF & E] to the bridge bank."

## A

The FDIC has the burden of proving its rent and conversion counterclaims at trial.

5. The FDIC's December 8, 1997 motion for partial summary judgment also contains a motion to strike Bank One's affirmative defenses to count five of the FDIC's counterclaim. In view of its ruling below dismissing count five, the court need not address the validity of the affirmative defenses. The court denies this part of the FDIC's motion as moot.

6. The FDIC objected during oral argument to Bank One's use of demonstrative exhibits that the FDIC contends include arguments and reasoning not contained in Bank One's briefing. In

Ownership of the FF & E during the relevant time period is an essential element of both causes of action. *See, e.g., Aparicio v. Morgan,* 868 S.W.2d 16, 17 (Tex.App.1993, no writ) (reasonable rental value); *Thompson v. Apollo Paint & Body Shop,* 768 S.W.2d 373, 377 (Tex.App.1989, writ denied) (reasonable rental value); *3–C Oil Co. v. Modesta Partnership,* 668 S.W.2d 741, 757 (Tex.App.1984, writ ref'd n.r.e.) (conversion). Because Bank One will not have the burden of proof as to these claims at trial, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the FDIC's counterclaims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If it does so, the FDIC must go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.; Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (per curiam). Summary judgment is mandatory where the nonmoving party fails to meet this burden. *Little,* 37 F.3d at 1076. Bank One has pointed the court to the absence of proof that the FDIC owns the FF & E. The FDIC is now obligated to introduce evidence that would permit a reasonable trier of fact to find that it is the owner.

## B

Section 3.1 of the P & A Agreement and §§ 17(h) and 18(e) of the Lease govern the ownership of the FF & E. Under § 3.1 of the P & A Agreement, the FDIC conveyed to Bank One the FF & E that MBank owned as of its close of business on March 28, 1989. Whether MBank owned the FF & E at that time is controlled by §§ 17(h) and 18(e) of the Lease. Together, these sections provide

a July 31, 1998 letter to the court (in which the FDIC responds to a post-argument letter from Bank One that relates to a question that the court does not reach in this decision), the FDIC reiterates its opposition to Bank One's reliance on new legal arguments. The court has analyzed Bank One's demonstrative aids by assessing whether they raise arguments included in Bank One's briefing, and has relied only on arguments and materials fairly presented in Bank One's briefs filed prior to oral argument.

that in the event "MBank shall commit an act of insolvency or shall be declared insolvent," ownership of the FF & E automatically transfers to MBank and the Lease terminates. Lease §§ 17(h), 18(e).

■ In its motion, Bank One asserts that multiple acts of insolvency occurred prior to the close of business on March 28, 1989, thus transferring ownership of the FF & E to MBank pursuant to §§ 17(h) and 18(e) of the Lease. What constitutes an "act of insolvency" is a question of contract interpretation. Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' true intentions as expressed in the instrument. *Parks v. DeWitt County Elec. Coop., Inc.*, 962 S.W.2d 707, 710 (Tex.App.1998, n.w.h.) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)). To achieve this objective, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* (citing *Coker*, 650 S.W.2d at 393). Language should be given its plain and grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. *Id.* (citing *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985)). Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous and the court will construe it as a matter of law. *Coker*, 650 S.W.2d at 393. A contractual provision is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation. *Id.* Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992); *Coker*, 650 S.W.2d at 394.

### C

The FDIC contends that the phrase "act of insolvency" is ambiguous because it is reasonably susceptible to more than one mean-

ing, Bank One is unable to provide a specific date on which the act of insolvency occurred, and Bank One failed to submit any evidence of the parties' intent in using the phrase.

■ The court rejects the FDIC's second and third arguments. Contrary to the FDIC's assertion in its second argument, Bank One has provided specific dates on which it alleges that acts of insolvency occurred—March 27 and 28, 1989.[7] And under Texas law, Bank One is not required to submit any evidence of the parties' intent in using the phrase "act of insolvency." This is so because "[a] determination of ambiguity should be made solely in reference to the language of the contract; extrinsic evidence should only be admitted after the contract is found to be ambiguous." *Bloom v. Hearst Entertainment, Inc.*, 33 F.3d 518, 522 (5th Cir.1994).

■ The court also disagrees with the FDIC's first contention—that the phrase "act of insolvency" is ambiguous because it is reasonably susceptible to more than one meaning. The FDIC asserts that Bank One's reference in its motion to different types of insolvency demonstrates that the phrase has more than one reasonable meaning. "A contract is not ambiguous merely because the parties have a disagreement on the correct interpretation." *REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 453 (5th Cir.1991) (footnote omitted). A contract is ambiguous only when the face of the instrument leaves it genuinely uncertain which of two or more meanings is the proper one. *Gibson v. Bentley*, 605 S.W.2d 337, 339 (Tex.Civ.App.1980, writ ref'd n.r.e.).

The parties agreed in § 17 of the Lease that an event of default, as defined therein, triggers the Ipso Facto Clause. Section 17 specifies eleven events of default. The list is comprehensive, covering such conduct as MBank's failure to pay rent or maintain collateral, MCorp's bankruptcy or receivership, MBank's insolvency, and Capital's failure to have a perfected security interest in the collateral

---

**7.** Although Bank One has adduced evidence that MBank was insolvent as of September 1988 on both a Generally Accepted Accounting Principles or book basis, and an equity basis, it does not contend that MBank thereby committed an act of insolvency.

lateral. The first paragraph of § 17 also provides that these eleven circumstances are events of default, "whatever the reason for such Event of Default and whether it shall be voluntary or involuntary, or come about or be effected by operation of law, or be pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body."

In light of the comprehensive scope of § 17, the court holds that the term "insolvency" unambiguously includes all types of insolvency, including commercial insolvency. Commercial insolvency occurs when a bank cannot carry on its ordinary course of business, satisfying the demands of depositors and creditors. *See MBank New Braunfels, N.A. v. FDIC,* 772 F.Supp. 313, 322 (N.D.Tex.1991) (Porter, J.). " 'The insolvency of the Bank Act is commercial insolvency.' " *Id.* (quoting *Kullman & Co. v. Woolley,* 83 F.2d 129, 131–32 (5th Cir.1936)); *see also Bender v. Etnier,* 26 F.Supp. 484, 487 (M.D.Pa.1939) (holding that an act of insolvency takes place when a bank has failed to pay some of its obligations, made an assignment for the benefit of creditors, suspended business, or done any of those things that indicate to creditors that a debtor has become insolvent) (citing *Hayden v. Chemical Nat'l Bank of N.Y.,* 84 F. 874, 876 (2d Cir. 1898)). When interpreting "act of insolvency" in § 91 of the National Bank Act,[8] courts consistently held that an act of insolvency occurred when a bank failed to pay some of its obligations or did anything else that showed that it was unable to meet its liabilities as they matured. *See, e.g., Willing v. Eveloff,* 94 F.2d 344, 346 (3d Cir.1938) (citing *Hayden,* 84 F. at 876–77). Given the parties' concern in preserving Capital's claim to the MCar Assets that secured MBank's Lease payments, the court holds that a more limited meaning of insolvency would not reflect the intent of the parties at the time they entered into the Lease.

Because the phrase "act of insolvency" can be given a definite legal meaning, the court holds that it is unambiguous. The court can interpret "act of insolvency" as a matter of law by attributing to the phrase its plain and ordinary meaning. To ascertain the ordinary meaning of a term, courts frequently look to the dictionary definition. *See, e.g., Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.,* 832 F.2d 1358, 1369–70 (5th Cir.1987); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 141 (Tex.1994). Black's Law Dictionary defines "act" as an "external manifestation of actor's will." BLACK'S LAW DICTIONARY 25 (6th ed.1990). The court has held that "insolvency," as used in the Lease, means all types of insolvency, including commercial insolvency. Therefore, the court holds that an "act of insolvency" under the Lease is an external manifestation of all types of insolvency, including commercial insolvency.

### D

Bank One has submitted competent summary judgment evidence that on March 27, 1989 and March 28, 1989, MBank failed to pay the demands of creditor MBank–New Braunfels and other creditor MBanks.[9] The FDIC has not introduced any evidence that would enable a reasonable trier of fact to find in its favor and thus to establish a genuine issue of material fact for trial. Accordingly, the court holds that an "act of insolvency" occurred prior to the close of MBank's business on March 28, 1989.

### E

The FDIC contends that Bank One's claim of ownership should be denied because the parties to the Lease clearly provided that the OCC's declaration of MBank's insolvency on March 28, 1989—not an act of insolvency—triggered the Ipso Facto Clause in the Lease. In support of its contention, the

---

**8.** "The National Bank Act, 12 U.S.C. § 91, prohibits all transfers made 'after the commission of an act of insolvency, or in contemplation thereof' that are made with a view to prevent the ratable distribution of the bank's assets, as required by 12 U.S.C. § 194." *MBank,* 772 F.Supp. at 322.

**9.** The FDIC objects to portions of Bank One's summary judgment evidence as conclusory and inadmissible hearsay. Because the court has not relied on any objectionable evidence, the FDIC's objections are denied as moot.

FDIC maintains that the parties have long acted in accordance with the belief that the declaration of insolvency, not an act of insolvency, triggered the Ipso Facto Clause. The court disagrees.

■ Under Texas law, the court must give "effect to the parties' intentions as expressed in the instrument." *City of Austin v. Houston Lighting & Power Co.,* 844 S.W.2d 773, 784 (Tex.App.1992, writ denied) (citing *Gracia v. RC Cola–7–Up Bottling Co.,* 667 S.W.2d 517, 520 (Tex.1984)). "The parties' objective, not subjective, intent controls." *Id.* (citing *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968)). The objective intent of the parties, as expressed in the Lease, provides that either an act or declaration of insolvency triggers the Ipso Facto Clause. Lease §§ 17(h), 18(e). Therefore, the parties' subjective belief, if any, that the declaration of insolvency triggered the Ipso Facto Clause is immaterial.

### F

■ The FDIC also opposes summary judgment on the basis that the parties waived any default that occurred as a result of an act of insolvency that occurred prior to the declaration of insolvency. The court addressed this argument in its October 8, 1997 memorandum opinion.

> To support its contention that the parties to the Lease properly waived all acts of insolvency as triggering the Ipso Facto Clause, the FDIC cites a Texas case for the proposition that a default in the performance of a contract may be waived. The FDIC's reasoning addresses only whether parties to a contract may waive performance defaults. It makes no attempt to explain how this rule affects the court's reasoning in *Bank One I* and *Bank One II*, concerning the requisites of provable claims, particularly the court's conclusion that at the time of MBank's insolvency, the

> status of the parties was permanently fixed.

Oct. 8, 1997 Mem. Op. at 4 (citations omitted). In its latest brief, the FDIC again focuses its reasoning on whether parties to a contract may waive performance defaults.[10]

■ "A waiver is an intentional release, relinquishment, or surrender of a known right." *R. Conrad Moore & Assocs., Inc. v. Lerma,* 946 S.W.2d 90, 93 (Tex.App. 1997, writ denied). "The following elements must be met to find waiver: (1) a right must exist at the time of the waiver; (2) the party who is accused of waiver must have constructive or actual knowledge of the right in question; and (3) the party intended to relinquish its right." *Id.*

The court rejects the FDIC's reurged waiver argument because the summary judgment evidence shows that, at the time of the alleged waiver, the parties to the Lease no longer possessed the right that they claim to have waived. The Lease conferred upon the parties the right to assert that an act of insolvency constituted an event of default. Once the Lease terminated, the parties no longer had this contractual right.[11] Pursuant to the Ipso Facto Clause, the Lease automatically terminated upon an act or declaration of insolvency. The evidence shows that an act of insolvency occurred on March 27, 1989, automatically terminating the Lease at that time.

The FDIC asserts that the parties waived acts of insolvency as events of default because the parties sought Casualty Value under the Ipso Facto Clause calculated as of March 29, 1989, rather than the date of any alleged act of insolvency; and Capital and Prudential, in the settlement agreement executed in 1995 ("Settlement Agreement"), intentionally relinquished any right to declare any prior act of insolvency as an event of default under the Lease. These waivers also occurred after the automatic termination of the Lease, however, when the parties no longer had the contractual right to rely upon

---

**10.** The FDIC also contends that a claim can be both provable and waivable.

**11.** After termination of the Lease extinguished all rights of the parties, the Ipso Facto Clause pro-

vided the Lessor with a post-termination right to payment from the Lessee for unpaid rent and Casualty Value. The FDIC does not contend that the parties waived this right to payment.

an act of insolvency as an event of default. Because, at the time of the purported waiver, the parties did not possess the right they attempted to waive, the court holds that they could not have waived acts of insolvency as events of default.

Accordingly, the court holds as a matter of law that the parties' failure to seek Casualty Value calculated on the basis of acts of insolvency and the Settlement Agreement are not valid waivers of acts of insolvency as events of default under the Lease.

G

The court now considers the FDIC's assertion that Bank One cannot enforce the Lease because it does not have standing and is not a third party beneficiary of the Lease.

The FDIC argues that Bank One does not have standing "to resurrect a claim that the parties to the Lease did not bring." FDIC Feb. 10, 1998 Resp. at 10. Bank One is not attempting to resurrect such a claim. Rather, it is pursuing its ownership rights in the FF & E pursuant to the P & A Agreement. The court has already determined that MBank owned the FF & E prior to the close of its business on March 28, 1989. It follows that Bank One has standing to challenge subsequent actions by parties attempting to waive an event of default that would affect its rights in a completed transaction.[12]

The FDIC also maintains that "in order to enforce the default provisions of the FF & E Lease, Bank One must be either a party to the lease or a third-party beneficiary under the Lease." *Id.* at 11. This argument fails because Bank One is not trying to enforce the default provisions of the Lease. As the court explained in *Bank One I*, the FF & E Lease terminated upon MBank's insolvency. Without option, notice, or any other action, the status of the parties was permanently fixed. MBank became immediately liable for any rent unpaid up to the day of insolvency, and also became obligated for the Casualty Value of the FF & E. *Bank One I*, 878 F.Supp. at 958. The FF & E Lease was

drafted so that when the FDIC took over as receiver, it obtained all the FF & E located on MBank's premises as if there had been no sale-leaseback transaction, and was able to convey it to the bridge bank (Bank One). *Id.* at 965. Bank One need not enforce the default provisions of the Lease because they operated automatically. Bank One is instead seeking to enforce § 3.1 of the P & A Agreement, by which the FDIC transferred to Bank One certain fixtures, and furniture and equipment, that MBank owned as of the close of business on March 28, 1989.

Accordingly, because the court holds that Bank One owns the FF & E pursuant to the P & A Agreement, and rejects the FDIC's alternative grounds for denying summary judgment, the court grants Bank One's December 30, 1997 motion for summary judgment, and dismisses the FDIC's claims for reasonable rental value and conversion. The court also denies as moot the FDIC's September 2, 1997 converted motion for summary judgment. Because an act of insolvency transferred ownership of the FF & E to Bank One, the court need not decide at what subsequent point in time the OCC declared MBank insolvent.

III

Bank One moves for summary judgment as to the FDIC's counterclaim for modification of contract. The FDIC contends in count two that if the P & A Agreement transferred ownership of the FF & E to Bank One, the parties, through the Assistance Agreement, modified the P & A Agreement to exclude the transfer.

The FDIC will have the burden at trial of proving that the P & A Agreement was modified. *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 581 (Tex.App.1998, n.w.h.). Bank One points the court to the absence of evidence that the Assistance Agreement modified the P & A Agreement. The burden has therefore shifted to the FDIC to designate specific facts showing that there is a

---

12. The FDIC's assertion that Bank One lacks standing to enforce the Lease because Bank One neither relied on the Lease when it entered into the P & A Agreement, nor on the fact that the

Ipso Facto Clause was triggered by an act of insolvency, is immaterial in light of the court's conclusion that Bank One is not seeking to enforce the Lease.

genuine issue for trial. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Little,* 37 F.3d at 1075.

 Under Texas law, "[w]hether a contract is modified depends on the parties' intentions and is a question of fact." *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227, 228–29 (Tex.1986); *see also Ghidoni,* 966 S.W.2d at 580. Nevertheless, because the FDIC contends that the parties modified the P & A Agreement by means of the Assistance Agreement, its counterclaim presents a question of contract interpretation, to be decided by the court as a matter of law.

The FDIC asserts that § 17.7 of the Assistance Agreement modified the P & A Agreement. Section 17.7 states that "[t]he provisions of this Agreement, to the extent they conflict with any provisions of the Purchase & Assumption Agreements, shall be controlling." Neither party contends that this proviso is ambiguous, and the court holds that it is not. Therefore, the court can interpret the meaning of this unambiguous provision as a matter of law by attributing to the clause its plain and ordinary meaning. *See Coker,* 650 S.W.2d at 393.

Section 17.7 of the Assistance Agreement modifies the P & A Agreement if "provisions" of the Assistance Agreement "conflict" with "provisions" of the P & A Agreement. The court turns to the dictionary definitions of "conflict" and "provision" in interpreting § 17.7. The American Heritage Dictionary defines "conflict" as "to come into opposition; collide; differ." THE AMERICAN HERITAGE DICTIONARY 279 (New College ed.1978). "Provision" is defined as "[a] stipulation or qualification; especially, a clause in a document or agreement." *Id.* at 1053.

The FDIC does not point the court to any clause in either agreement that stipulates or qualifies the ownership of the FF & E, or any clauses that differ between the two agreements. Rather, the FDIC asserts that

§ 17.7 governs because the two agreements conflict in how they treat the ownership of the FF & E.[13] The conflict that the FDIC alleges is one between underlying premises of the two agreements. The plain language of § 17.7, however, requires a conflict between contractual *provisions.* Absent such a conflict, the court holds that § 17.7 of the Assistance Agreement does not modify the P & A Agreement so as to exclude the transfer of ownership of the FF & E to Bank One.[14]

The court's conclusion is bolstered by the fact that there is no language in the Assistance Agreement that purports to modify the P & A Agreement so as to nullify any transfer of property. Moreover, the distinct and separate purposes of the two agreements demonstrate the parties' lack of intent to modify the P & A Agreement to the extent the FDIC suggests. The purpose of the P & A Agreement was to transfer all deposits and certain liabilities and assets from the MBank receivership estate to Bank One. The purpose of the Assistance Agreement was to establish a procedure for valuing the assets and liabilities of Bank One and to establish the manner in which the FDIC would pay assistance to Bank One. Significantly, given that the issue of ownership of the FF & E is still disputed, it would have been virtually impossible for the FDIC and Bank One to have intended that the Assistance Agreement modify the P & A Agreement regarding the ownership of the FF & E.

The court holds that the undisputed facts do not demonstrate that Bank One and the FDIC intended to modify the P & A Agreement so as to prevent ownership of the FF & E from transferring from the FDIC to Bank One. The court grants Bank One's January 20, 1998 motion for summary judgment to the extent that it dismisses the FDIC's counterclaim for modification.

---

13. The FDIC contends that the P & A Agreement treats the FF & E as if it had been transferred to Bank One and the Assistance Agreement treats the FF & E as if it had not been transferred.

14. The FDIC also relies on evidence of the conduct of Bank One and the FDIC in an attempt to show that the parties intended that the Assis-

tance Agreement modify in part the P & A Agreement. The court will consider extrinsic evidence of the parties' intent when a contract is found to be ambiguous. Because § 17.7 is unambiguous, the court cannot consider the FDIC's extrinsic evidence of the parties' intent.

## IV

Bank One also moves for summary judgment dismissing the FDIC's reformation counterclaim.

The FDIC asserts that if the P & A Agreement transferred ownership of the FF & E to Bank One, the FF & E was transferred due to mutual mistake, and the P & A Agreement should be reformed to reflect the parties' intentions not to transfer such ownership.

▪▪▪▪ Under Texas law, a party seeking reformation must prove (1) an original agreement and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex.1987) (citation omitted). "The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties." *Id.*

▪▪▪▪ Bank One points this court to the absence of evidence that the FDIC and Bank One agreed prior to the execution of the P & A Agreement, as amended, that the FF & E was to be treated as "leased" and not "owned," regardless of the actual status of the FF & E. To survive summary judgment, the FDIC must designate specific facts showing a genuine issue of material fact regarding the existence of such an agreement. The FDIC has not met this evidentiary burden.

The FDIC has introduced summary judgment evidence that the parties acted, and amended the P & A Agreement, while laboring under the mistaken belief that the FF & E was leased rather than owned by MBank as of the close of business on March 28, 1989. The FDIC has offered no evidence, however, of any specific agreement or intent not to transfer to Bank One the FF & E that MBank owned, or to treat the FF & E as "leased" regardless of its actual status. In fact, the FDIC's corporate representative, Carroll Shifflett ("Shifflett"), testified that he knew of no discussions, negotiations, or agreements between the FDIC and DIBB that took place before execution of the original P & A Agreement and that addressed any special treatment of the FF & E Lease. Shifflett Dep. at 20–21; 54–56.

Accordingly, the court grants Bank One's May 13, 1998 motion for summary judgment to the extent of dismissing the FDIC's reformation counterclaim.

## V

The FDIC and Bank One have filed cross motions for partial summary judgment as to the FDIC's counterclaim for breach of contract. The FDIC has also moved to dismiss Bank One's affirmative defenses to this counterclaim.

## A

▪▪▪▪ Both parties move for summary judgment on the FDIC's counterclaim that Bank One breached § 7.3 of the Assistance Agreement, which provides, in relevant part:

> After [April 15, 1990], the Commencement Balance Sheet will not be subject to further adjustment ... *unless to correct manifest error, omission or as otherwise mutually agreed upon by the parties* .... If further adjustment under this Section 7.3 results in an amount which is negative, the Bank will repay to the FDIC within 30 days of such further adjustment a portion of the amount paid under Section 6.4 equal to such further adjustment amount, with interest at a rate per annum equal to the Cost of Carry from the Commencement Date to the date of payment of such further adjustment amount.

Assistance Agreement § 7.3 (emphasis added). The general purpose of this section was to protect the parties against unfairness in the assistance calculation arising from the haste with which the FDIC was required to act at the time it became the receiver of MBank. Section 7.3 safeguarded the parties by providing a narrow exception to the general agreement that the Commencement Balance Sheet was not subject to further adjustment.

At the time the parties executed the Assistance Agreement, the value of the FF & E was not included in the Commencement Balance Sheet. If it is determined that Bank One owns the FF & E, the FDIC maintains that

the failure to include it in the Commencement Balance Sheet constitutes a manifest error or omission [15] that entitles the FDIC to adjustment and repayment under § 7.3. Because Bank One allegedly has failed and refused to adjust the Commencement Balance Sheet and to repay the FDIC for overpaid assistance, the FDIC asserts that Bank One has breached § 7.3 of the Assistance Agreement.

As the party with the burden of proof at trial as to this counterclaim, in order to obtain summary judgment in its favor, the FDIC must present evidence that establishes "beyond peradventure *all* of the essential elements of the claim." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original). The essential elements of a breach of contract claim are that (1) a contract existed between the parties; (2) the contract created duties; (3) the defendant breached a material duty under the contract; and (4) the plaintiff sustained damages. *Solis v. Evins*, 951 S.W.2d 44, 50 n. 3 (Tex.App. 1997, no writ).

The parties do not dispute that the Assistance Agreement existed and that the agreement created duties. Therefore, the court turns to whether the FDIC has established that Bank One breached its duties of adjustment and repayment under § 7.3. The first sentence of § 7.3 states that "the Commencement Balance Sheet will not be subject to further adjustment ... unless to correct manifest error, omission or as otherwise mutually agreed by the parties." It is unmistakably a condition precedent to further adjustment and repayment under § 7.3 that there be a "manifest error" or "omission." [16] Whether a "manifest error" or "omission" exists requires first that the court interpret the contract. These terms are unambiguous, but the Assistance Agreement does not define them. Accordingly, the court will therefore apply their ordinary meanings.

**B**

The court first considers the meaning of "manifest error." Black's Law Dictionary defines "manifest" as "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." BLACK'S LAW DICTIONARY 962 (6th ed.1990). "Error" is defined as "[a] mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law" and "[a]n act involving a departure from truth or accuracy; a mistake; an inaccuracy; as, an error in calculation." *Id.* at 542–43. Under these definitions, a "manifest error" is an obvious mistake or departure from the truth.

The FDIC contends that the failure to include the FF & E in the assistance calculation was based on the mistaken belief of the parties that Bank One did not own the FF & E. Assuming *arguendo* that this failure constituted an error, the court holds that it could not qualify as a manifest error. Given the fact that the ownership of the FF & E has been a source of heated controversy in this litigation, the parties' belief that Bank One did not own the FF & E when calculating the assistance to which Bank One was entitled could not have been clear and evident error.

The court next considers the meaning of "omission." The purpose of § 7.3 was to protect against a manifest error or omission in the Commencement Balance Sheet that rendered the assistance calculation unfair. In view of this purpose, the court need not define "omission" in all respects because it is clear from the objective language of the agreement that the parties intended "omission" to be an *unintentional* omission. If this were not so, either party would have the right to alter the agreement unilaterally, despite intentional choices made at the time it entered into the contract. The summary

---

15. The FDIC's Fed.R.Civ.P. 30(b)(6) witness testified that the parties have not "otherwise mutually agreed" to a further adjustment of the Commencement Balance Sheet. Sherwin Koopmans Dep. at 237.

16. Because the terms "manifest error" and "omission" are separated by a comma, the court concludes that "manifest" only modifies the term "error." *See, e.g., Mitsui Mach. Distribution, Inc. v. Chase Manhattan Leasing Co. (Mich.),* 1994 WL 706309, at *4 (Tex.App.1994, no writ).

judgment evidence is undisputed that the FDIC and Bank One intentionally omitted the FF & E from the Commencement Balance Sheet. The court therefore holds that the failure to include the FF & E does not constitute an "omission" within the meaning of § 7.3.

Having failed to demonstrate that Bank One breached its duties of adjustment and repayment under § 7.3, the court denies the FDIC's motion for summary judgment as to its breach of contract counterclaim. Because the FDIC, in response to Bank One's pointing this court to the absence of evidence of a breach of a material duty, has failed to establish a genuine issue of material fact in regard to Bank One's alleged breach of contract, the court grants summary judgment dismissing this counterclaim.[17]

The court grants the part of Bank One's January 20, 1998 motion for summary judgment that addresses the FDIC's breach of contract claim and denies the FDIC's December 8, 1997 motion for partial summary judgment.

## VI

The court now considers Bank One's motion for summary judgment as to the FDIC's counterclaims for unjust enrichment and *quantum valebant*.[18]

The FDIC contends that if the court determines that the P & A Agreement transferred ownership of the FF & E to Bank One, if the P & A Agreement was not modified, if it is not appropriate to reform the P & A Agreement, and if the Assistance Agreement is not applicable to the present proceeding, then the FDIC is entitled under equitable principles to payment for the sale of the FF & E to Bank One. The court disagrees.

■ "Recovery on either unjust enrichment or *quantum meruit* is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either if the same subject is covered by an express contract." *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex.App.1988, writ denied) (citing *Truly v. Austin*, 744 S.W.2d 934 (Tex. 1988)).[19] The FDIC's right to recover under its equitable claims is dependent on Bank One's right to use and possession of the FF & E and the terms and conditions of the FDIC's entitlement to repayment for overpaid assistance to Bank One.

■ Bank One's right to use and possession of the FF & E is expressly governed by the P & A Agreement, which transferred ownership of the FF & E to Bank One. Because this right is covered by an express contract, the FDIC is not entitled to recover under the theories of unjust enrichment and *quantum valebant* for the value of the FF & E.

The Assistance Agreement expressly covers the subject of the FDIC's right to recover from Bank One any overpayment of assistance. *See* Assistance Agreement § 7.3. It provides a finite period for such recovery, which ends when the contract terminates.[20]

---

**17.** The court denies the FDIC's motion to strike Bank One's affirmative defenses to this counterclaim as moot. *See supra* note 5.

**18.** Under Texas law, a plaintiff has a right to recover in *quantum valebant* the reasonable value of goods sold and delivered as well as a right to recover in *quantum meruit* the reasonable value of services rendered. 64 TEX. JUR. 3d *Restitution and Constructive Trusts* §§ 2, 10 (1989). Recovery is based on a quasi-contract or a promise implied in law to pay the plaintiff. *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex.App. 1988, writ denied) (citing *Truly v. Austin*, 744 S.W.2d 934 (Tex.1988)). Bank One asserts that under Texas law, the claim of *quantum valebant* has evolved into a *quantum meruit* cause of action. The court agrees with Bank One that in recent years Texas courts have addressed *quantum valebant* claims less frequently than they

have *quantum meruit* claims. The cases do not indicate, however, that *quantum valebant* is no longer a distinct cause of action under Texas law.

**19.** Given the lack of case law discussing *quantum valebant* claims and the identical theories behind *quantum valebant* and *quantum meruit* claims, the court will apply the law as it has developed in relation to recovery under *quantum meruit* to the FDIC's counterclaim for recovery under *quantum valebant*.

**20.** The FDIC maintains that the termination provision in § 17.15 of the Assistance Agreement has nothing to do with § 7.3. The court disagrees. Section 17.15 provides that the Assistance Agreement remains in full force and effect until the later of two specified events takes place. Section 17.15 also identifies specific provisions that are to continue in full force and effect, however,

*See id.* § 17.15. Bank One maintains that the FDIC forfeited any right to recover for overpayment by not asserting the right while the Assistance Agreement was in effect. The FDIC responds that if the term of the Assistance Agreement has expired, no express agreement covers the subject of overpayment, and recovery is available under equitable principles. The FDIC has not cited, and the court's own research has not located, a Texas case that suggests that once a contract has expired, a right of recovery in quasi-contract or a contract implied in law is activated. Indeed, such an exception would largely swallow the rule.[21]

The FDIC also asserts that its breach of contract and unjust enrichment claims are distinct because they involve different proofs and remedies.[22] The court disagrees. That the remedies under the two claims might differ does not change the fact that the Assistance Agreement expressly covers the subject of the overpayment of assistance.

The court grants Bank One's May 13, 1998 motion for summary judgment to the extent of dismissing the FDIC's counterclaims for unjust enrichment and *quantum valebant.*

## VII

The FDIC's February 13, 1998 motion for partial summary judgment as to Bank One's affirmative defenses of estoppel, failure to mitigate damages, and unclean hands is denied as moot. Having granted summary judgment in favor of Bank One as to each of the FDIC's counterclaims, the court need not decide whether Bank One's affirmative defenses are meritorious.

## VIII

This lawsuit is Protean in its dimensions. Following the court's decision in *Bank One I* and a settlement of part of the case, Bank One and the FDIC have vigorously litigated the question of ownership of the FF & E. Today's decision, which alters the outcome forecast in *Bank One II,* demonstrates the immutable truth that summary judgment reflects the evidence and arguments before the court at the time of decision; that "because the court's substantive rulings are necessarily the product of the issues and arguments presented, the holdings of prior opinions—regardless of their breadth—must be underst[ood] in their proper context[;]"[23] and that the court's discretion to consider successive motions for summary judgment, based on additional evidence,[24] can produce different results on further consideration of new arguments, evidence, and briefing.

This decision does not cast a dark shadow on the efforts of the FDIC and its capable counsel to marshal the assets of failed institutions and preserve those resources for the benefit of its fund and the public. The court has emphasized that "[t]he fact that a transaction entered into pre-insolvency will burden, or reduce the worth of, a receivership estate is simply 'but one aspect of the grim reality that faces the FDIC upon the failure of a financial institution.'" *Bank One I,* 878 F.Supp. at 966 (quoting *Irving Indep. Sch. Dist. v. Packard Props., Ltd.,* 762 F.Supp. 699, 703 (N.D.Tex.1991) (Fitzwater, J.), *aff'd,* 970 F.2d 58 (5th Cir.1992)). In the present case, the FDIC took MBank in the condition it found it. It was unable to recover the

---

after the Assistance Agreement has terminated. Section 7.3 is not among the provisions that § 17.15 designates as remaining in effect following termination of the Assistance Agreement.

21. Alternatively, the Joint Litigation Agreement tolls until the final resolution of this lawsuit the statute of limitations insofar as it affects claims arising under the Assistance Agreement. Because the FDIC's right to repayment for excess assistance is governed by the Assistance Agreement, a valid, express contract, the FDIC cannot recover under the equitable theories of unjust enrichment and *quantum valebant.*

22. The FDIC contends that under its breach of contract claim, its recovery would be limited to

the fair market value of the FF & E and prejudgment interest measured in terms of the cost of carry, because that is the recovery permitted under the terms of the Assistance Agreement. It maintains that under its unjust enrichment claim, however, recovery for the value of the FF & E and prejudgment interest would not be limited to the terms of the Assistance Agreement.

23. Apr. 28, 1997 Ord. at 2 (footnote omitted).

24. Oct. 8, 1997 Mem. Op. at 5 (citing *Enlow v. Tishomingo County, Miss.,* 962 F.2d 501, 507 & n. 16 (5th Cir.1992)).

MCar Assets because "through careful planning, Capital and Prudential crafted provable claims against the MCar Assets." *Id.* at 960. It cannot now recover on the FF & E because, under the peculiar circumstances of this case, the carefully-crafted provable claim, coupled with MBank's acts of insolvency and the terms of the P & A Agreement, caused the FF & E to be conveyed to Bank One.

\* \* \*

The court denies as moot the FDIC's converted September 2, 1997 successive motion for partial summary judgment; denies the FDIC's December 8, 1997 motion for partial summary judgment on count five of its counterclaim and denies as moot the motion to strike Bank One's affirmative defenses to count five; and denies as moot its February 13, 1998 motion for partial summary judgment on Bank One's affirmative defenses. The court grants Bank One's December 30, 1997 motion for summary judgment, January 20, 1998 motion for partial summary judgment, and May 13, 1998 motion for partial summary judgment.[25] The court has filed a judgment of dismissal today.

**SO ORDERED.**

---

25. The court denies the FDIC's January 15, 1998 motion for protective order as moot.